738 F.2d 1418
 Helen VANCE, Henry Posey, Glenn Rogers, Luther Myers, Zena
Farley Oliver, Iva M. Turner, Millie Vickery, James C.
Mitchell, Helen Birchfield, Eva Arrington Hall, Willa Mae
Trull, Ruth Hicks, Zula Christie, Joe Cable, Edna Henry,
Ruby Marlowe, Della Birchfield, Mary Cabb Yarborough, Sam
Cable, Barbara Pilkington, Carl Tipton, David Welch, Roy
Welch, Pauline Ball, Theodore Herron, Nancy Pilkington, Appellants,
v.
TENNESSEE VALLEY AUTHORITY, Department of Interior, (United
States of America), James Watt, Secretary of the
Interior, Swain County, and State of
North Carolina, Appellees.
 No. 83-2105.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 4, 1984.
Decided July 19, 1984.
 
 Russell L. McLean, III, Waynesville, N.C. (McLean & Dickson, P.A., Waynesville, N.C., on brief), for appellants.
 James E. Fox, Associate Gen. Counsel, Tennessee Valley Authority, Knoxville, Tenn., Blake A. Watson, Land and Natural Resources Division, Dept. of Justice, Washington, D.C. (F. Henry Habicht, II, Asst. Atty. Gen., Dirk D. Snel, Land and Natural Resources Div., Dept. of Justice, Washington, D.C., Herbert S. Sanger, Jr., Gen. Counsel, Tennessee Valley Authority; Justin M. Schwamm, Sr., Asst. Gen. Counsel, Thomas C. Doolan, Tennessee Valley Authority, Knoxville, Tenn., Joseph A. Pachnowski, Pachnowski & Collins, P.A., Bryson City, N.C., Charles M. Hensey, Asst. Atty. Gen., North Carolina Dept. of Justice, Raleigh, N.C., on brief), for appellees.
 Before WINTER, Chief Judge and HALL and SPROUSE, Circuit Judges.
 K.K. HALL, Circuit Judge:
 
 
 1
 Plaintiffs appeal from the district court's order dismissing their suit against the Tennessee Valley Authority ("TVA") and various federal and state defendants for specific performance of alleged contractual rights and other injunctive relief.[1] We affirm, although on a different ground from the one cited by the district court.
 
 I.
 
 2
 Plaintiffs are the heirs of deceased persons buried in twenty private and public cemeteries, which are located on a 44,400-acre tract of land in Swain County, North Carolina (the "County"). This land was acquired by the United States in the 1940's through a combination of purchase and condemnation on behalf of TVA to erect a dam, watershed, and reservoir, known as Fontana Lake. TVA's acquisition was subject to outstanding burial and access rights to the property. The only road access to the cemeteries was obstructed in 1944 when State Road 288 was flooded by water impounded to form the reservoir.
 
 
 3
 Two hundred and sixteen families, which included plaintiffs and their relatives, lived in the area affected by the construction of the dam and reservoir and, before the flooding of the state highway, relied on this road access to visit the cemeteries. Before acquiring the land, TVA had approached the residents with a choice of either leaving the grave sites intact or having the remains reinterred at an alternative site at TVA's expense. Plaintiffs and their relatives chose to leave the remains in their original location, claiming that they relied upon certain promises by TVA that the Department of the Interior ("Interior") would construct a road to provide access into the area.
 
 
 4
 In 1943, TVA entered into a written contract with Interior, the County, and the State of North Carolina (the "State"), as a means of extinguishing TVA's liability for flooding the State highway. This contract provided, inter alia, that TVA would acquire from the private owners the entire 44,400 acres, using in part $100,000 contributed by the State, pay the County $400,000 to help satisfy its outstanding bond indebtedness for the flooded roads, and transfer the acquired lands to Interior's National Park Service ("Park Service") for inclusion in the Great Smoky Mountains National Park ("Park").[2] The contract further stated that Interior agreed to construct a road through the Park around the north side of the lake, and that the State would construct a public road outside the Park to connect with the Park road. These two roads would provide access by way of motor vehicle to the cemeteries in question.
 
 
 5
 Interior's obligation to build the Park road was, however, contingent on the appropriation of funds by Congress. Section 4 of the agreement stated in pertinent part as follows:
 
 
 6
 The obligation of the Department [of the Interior] to construct or provide for the construction of a Park Road as defined in this Section 4 shall be subject to and contingent in all respects upon the appropriation by Congress of all funds necessary for such construction, and failure on the part of Congress for any reason to make such appropriations shall not constitute a breach or violation of this agreement by the Department or any other party hereto.
 
 
 7
 The 1943 contract was consummated in 1948 when TVA transferred the land to Interior with the express approval of the President of the United States.
 
 
 8
 The State built the access road to the Park line and Congress appropriated $6,189,000 through fiscal year 1972 for construction of the Park road. Three segments of the road, totalling 5.6 miles, were completed between 1963 and 1968. Due to serious difficulties encountered in constructing the road, including problems with the composition and formation of the underlying rock, the Park Service eventually determined that it was not environmentally or economically feasible to continue the project, and no major work on the road has occurred since 1972. Nevertheless, plaintiffs allege that from 1943 until 1982, TVA and various federal and state officials promised that the Park road would be built to provide access to the cemeteries and it was not until 1982 that plaintiffs were informed for the first time that no road access would be forthcoming.
 
 
 9
 Contending that they are third-party beneficiaries of the 1943 contract, plaintiffs brought suit in June, 1983, against TVA, Interior, the Secretary of the Interior, the County, and the State to compel construction of the Park road and to prevent the contracting parties from entering into a settlement agreement without providing for the construction of the road. In their complaint, plaintiffs also alleged that:
 
 
 10
 [A]t the time of the acquisition of lands by purchase or condemnation, the acquisition team of the TVA represented to the Plaintiffs or their heirs and others that access to the area purchased would be provided by a newly constructed road and produced copies of the [1943] contract between the government and the people of the State of North Carolina as an enticement or an inducement to sell their lands and insuring to them access to the area for the purposes of preservating [sic] ingress and egress to the cemeteries in the subject area. (emphasis added)
 
 Plaintiffs further alleged that:
 
 11
 [They] or their predecessors in interest and others were directly advised, promised, and represented that upon the transfer of their lands and property that their rights of access to the cemeteries would be protected and preserved by the road hereinabove referred to and upon such material representation, made transfer of their property to the Defendant, TVA, upon the contract and promise of the government to complete the road. The failure to construct the road as promised constitutes a material breach of contract upon which the Plaintiffs or their predecessors were enticed to conveyance by deed of their lands to the TVA and as such are entitled to a recision [sic] of the agreement and a return of the property to the grantors or their successors in interest. (emphasis added)
 
 
 12
 Finally, plaintiffs in an amendment to their complaint asserted that:
 
 
 13
 Since 1944 and continuing up to and including 1981, the Defendants, and each of them, by and through their respective agents, representatives and employees, have continued by actions, conduct and inducements or promises stated, represented and held out to the Plaintiffs and others that the "Fontana-North Shore Road" would provide access into the area hereinabove described to the cemeteries where the Plaintiffs [sic] heirs are buried.
 
 
 14
 Plaintiffs alleged that the visits to and the maintenance and decoration of these cemeteries were a part of the practice of their Christian religious faith and that defendants' denial of road access to these grave sites constituted a deprivation of plaintiffs' freedom of religion in violation of the First Amendment to the United States Constitution. They requested the district court to order TVA to lower the water level in Fontana Lake below plaintiffs' previous access along State Road 288, or, in the alternative, to require Interior to construct the Park road along the north shore of the lake so as to allow them free access by motor vehicle to the cemeteries.[3]
 
 
 15
 Defendants denied liability for breach of contract or other wrongdoing and asserted that plaintiffs lacked standing to sue, had suffered no deprivation of constitutional rights, and were barred from seeking relief by the statute of limitations, laches, and public policy. Defendants moved to dismiss the action, pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim, or in the alternative for summary judgment under Fed.R.Civ.P. 56. The district court dismissed the action, holding that plaintiffs were only incidental beneficiaries of the 1943 agreement and, as such, had no enforceable rights and no standing to sue under the agreement. Plaintiffs appeal.
 
 II.
 
 16
 On appeal, plaintiffs contend that they have the requisite standing to sue for equitable relief under the 1943 contract and that they have alleged and demonstrated sufficient facts to withstand summary judgment. We conclude that whether or not they have standing to sue is immaterial, because we find that any agreement to construct a road was never breached.
 
 
 17
 In dismissing plaintiffs' action, the district court concluded that because the 1943 contract was not intended for the direct benefit of plaintiffs, they remained only incidental beneficiaries of the agreement without any right to seek relief for breach of contract or specific performance.[4]
 
 
 18
 Although the district court's conclusion may well be correct, insofar as the 1943 written contract is concerned, it fails to address the standing plaintiffs may have to sue on the promises and inducements concerning the road's construction, which were allegedly made by TVA and government representatives both at the time and after the written contract took effect. For example, plaintiffs allege that after the 1943 contract was signed, it was used by TVA as an inducement for plaintiffs and their relatives to sell their land. The record also reveals that on July 31, 1943, one day after the 1943 contract was entered into on July 30th, a letter was addressed by TVA to the next-of-kin of one of the persons buried in the affected area. The letter enclosed a "remain agreement," to be signed and returned if the addressee wanted the grave left undisturbed, and explained the alternative procedure for reinterment at TVA's expense "[i]f it is your desire that the grave of your relative be moved to some neighboring cemetery which is accessible by road." This letter further stated as follows:
 
 
 19
 The construction of Fontana Dam necessitates the flooding of the road leading to the Proctor Cemetery located in Swain County, North Carolina, and to reach this cemetery in the future [it] will be necessary to walk a considerable distance until a road is constructed in the vicinity of the cemetery, which is proposed to be completed after the war has ended. (emphasis added)
 
 
 20
 Nevertheless, even if these additional oral and written inducements provide plaintiffs the necessary standing to sue, they still cannot prevail. It is clear that these promises at least implicitly incorporated the provisions of the 1943 written contract between defendants TVA, Interior, the County, and the State, including the contingency of a congressional appropriation.[5] Because the 1943 contract so clearly provided that Interior's obligation to construct a road was in all respects contingent upon the appropriation of all necessary funds, plaintiffs would never be able to demonstrate a breach of agreement. Nor was there any obligation for Interior to seek further appropriations. The contract specifically provided that "failure on the part of Congress for any reason to make such appropriations shall not constitute a breach or violation of this agreement by the Department or any other party hereto." (emphasis added). Thus, this is not a case where plaintiffs could assert an estoppel-type argument against defendants based on promises to construct this road.[6]III.
 
 
 21
 Accordingly, we hold that the agreement to construct a road was never breached and for that reason, the district court's dismissal of plaintiffs' action must be affirmed.
 
 
 22
 AFFIRMED.
 
 HARRISON L. WINTER, Chief Judge, dissenting:
 
 23
 The district court dismissed plaintiffs' claims on the grounds that plaintiffs had no standing to sue on the 1943 agreement among the defendants. Although the majority does not pass directly on the correctness of that ruling, it does conclude correctly that the district court was in error in failing to address the question of whether plaintiffs had standing to sue on the promises and inducements concerning the construction of the road made by TVA and government representatives both before and after the 1943 agreement. Nonetheless, the majority concludes that plaintiffs' suit was properly dismissed because the promises and inducements alleged by plaintiffs "implicitly" incorporated the provisions of the 1943 agreement and that agreement was never breached. I disagree with those reasons, and I therefore respectfully dissent.
 
 I.
 
 24
 Neither the plaintiffs' complaint nor affidavits accompanying it support the majority's conclusion that plaintiffs' claims rest solely on the 1943 agreement. In their third claim for relief, not referred to by the majority in its opinion, plaintiffs allege that they
 
 
 25
 or their predecessors in interest and others were directly advised, promised, and represented that upon the transfer of their lands and property that their rights of access to the cemeteries would be protected and preserved by the road herein above referred to and upon such material representation, made transfer of their property to the Defendant, TVA, upon the contract and promise of the government to complete the road. That failure to construct the road as promised constitutes a material breach of contract upon which the Plaintiffs or their predecessors were enticed to conveyance by deed of their lands to the TVA and as such are entitled to a recision of the agreement and a return of the property to the grantors or their successors in interest.
 
 
 26
 Nowhere in this claim for relief is reference made to the 1943 agreement. Rather, plaintiffs allege that they or their predecessors in interest were simply told by government agents, as part of the inducement to plaintiffs to convey their property to the TVA, that a road would be built. They thus advance a claim that, independently of any obligations that defendants may have had under the 1943 agreement to build an access road, defendants were obligated directly to plaintiffs to construct a road.
 
 
 27
 Plaintiffs' allegations in this regard are supported by affidavits and by the letter of July 31, 1943, cited by the majority, in which a TVA supervisor indicated that those wishing to visit cemeteries isolated by the proposed reservoir should have to walk "a considerable distance until a road is constructed ..., which is proposed to be completed after the war has ended."[1] Concluding as I do that plaintiffs allege an independent obligation running to themselves from defendants to construct an access road that is independent of the 1943 agreement, I do not believe that plaintiffs' claims can be dismissed simply by finding that the 1943 agreement among defendants has not been breached.[2]
 
 II.
 
 28
 Even if it may correctly be decided that all of plaintiffs' claims are founded on the 1943 agreement as incorporated into the other promises and representations made to plaintiffs, I also disagree with the majority's conclusion that there has been no breach thereof. The majority concludes that, since the 1943 agreement conditioned the Department of the Interior's obligation to build the road on appropriation of funds for the purpose by Congress, so long as Congress has made no such appropriation, there has been no breach. We were told in argument, however, that money for the road has not been appropriated not because Congress declined to do so, but because the Department of the Interior decided not to ask for the appropriation.
 
 
 29
 While the "availability of funds" clause included in the 1943 agreement may be adequate to preclude any obligation on the part of the federal government to provide funds for the road, it does not seem to me that the clause can be read to relieve the Department of the Interior of any obligation even to seek appropriations for the road. If the Department of the Interior had determined what appropriation was necessary to build the road and had placed that amount in budget requests and the request had been rejected by Congress, that would be a different matter. Where, as here, the Department on its own has determined to renege on the contract, however, there may be grounds for finding the Department to have failed to fulfill its contractual obligations.[3] I would conclude that plaintiffs adequately allege a failure by the Department of the Interior to meet its obligations under the 1943 agreement.[4]
 
 
 30
 Thus I would conclude that summary dismissal of plaintiffs' complaint was not justified. I would reverse the judgment of the district court and remand the case for further proceedings.
 
 
 
 [1]
 In addition to TVA, the other defendants are the Department of the Interior, the Secretary of the Interior, Swain County, North Carolina, and the State of North Carolina
 
 
 [2]
 The constitutional and statutory validity of TVA's actions was upheld by the Supreme Court in United States ex rel. Tennessee Valley Authority v. Welch, 327 U.S. 546, 66 S.Ct. 715, 90 L.Ed. 843 (1946)
 
 
 [3]
 Plaintiffs concede that the Park Service has provided them with boat access to the burial sites, but claim that such access has been infrequent, irregular, and a hardship, particularly for the elderly
 
 
 [4]
 The district court reasoned as follows:
 By the terms of the agreement TVA agreed in the name of the United States of America to commence and thereafter prosecute in a systematic, orderly, and diligent manner the acquisition by purchase, the exercise of eminent domain, or otherwise, the land identified as the 44,400, known as the "Fontana Addition." Since all of the land was to be acquired and made a part of the Park it is logical to assume that the parties to the agreement knew there would be no need for State Road 288. All of the residents of the area were to move out and the cemeteries were to be moved at TVA's expense unless the nearest surviving relatives elected to leave the remains in the remote areas. Thus the people who moved out would have no more rights to have the Park Road constructed than any other citizen. This would make the Plaintiffs and all other citizens merely incidental beneficiaries.
 
 
 [5]
 Even the letter dated July 31, 1943, cannot be construed as a direct promise to build the road independent of the provisions in the 1943 contract. Dated one day after the 1943 contract was entered into, the letter merely states that access to the cemeteries will be limited until such time as the proposed road is constructed. Clearly this wording is a reference to the road proposed to be built in accordance with the terms of the just executed 1943 contract, including the requirement for congressional funding
 
 
 [6]
 Estoppel against the government is in any event not favored. As the Supreme Court has recently reiterated:
 [I]t is well-settled that the Government may not be estopped on the same terms as any other litigant ... [although] we are hesitant, when it is unnecessary to decide this case, to say that there are no cases in which the public interest in ensuring that the government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor and reliability in their dealings with their government.
 Heckler v. Community Health Services of Crawford County, Inc., --- U.S. ----, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984) (footnotes omitted).
 
 
 [1]
 The majority apparently believes that the letter itself indicated the contingent nature of the access road and was adequate to put the plaintiffs or their ancestors on notice of the provisions of the 1943 agreement making the federal government's obligation to build the road contingent on congressional action to fund it. I cannot agree. First, the letter does not even mention, explicitly or implicitly, the 1943 agreement. There is no indication in the letter that its representations rested upon or were made contingent by an inter-governmental agreement. Second, it seems to me that the letter indicated, in simple terms, that a road would be built, though it was proposed not to undertake construction until after the war. It is, of course, true that the letter indicated some uncertainty as to when exactly the road would be completed, but that is much different than contingency as to whether the road ever would be built
 Of course, the Department of the Interior has now decided not to build the road at all. I can only conclude that this eventuality was not suggested by the language of the letter, nor, quite possibly, by other representations made to plaintiffs or their ancestors by government agents, and thus that the federal government's present position with regard to construction of the road contravenes its earlier statements.
 
 
 [2]
 I do not mean to suggest that on the basis of the present record an obligation independent of the 1943 agreement running from defendants to plaintiffs necessarily could be found. That would require further evidentiary development by the district court to determine the nature of any representations made to plaintiffs or their ancestors, by whom any such representations were made and whether the representations were within the authority of those making them, and the nature of plaintiffs' reliance. I merely rest my dissent on the fact that plaintiffs allege such representations and claim relief thereon, and that the majority's reliance on analysis of the defendant's obligations under the 1943 agreement thus does not adequately dispose of plaintiff's claims
 
 
 [3]
 I note that a request for funds for the road by the Department, unlike construction of the road itself, would not require specific appropriation by Congress. The exculpatory clause conditioning the government's obligation to build the road on Congress's appropriating money thus would not be relevant to establish a condition precedent to the Department's obligation to seek funds from Congress to build the road
 It seems that an obligation on the part of the Department to seek funds from Congress for the road was implicit in the contractual terms. Certainly undertakings of any type whatsoever by the executive would be rendered meaningless if we were to conclude that, upon a change of official position, the executive departments could with impunity reconsider a contractual undertaking and never so much as seek to obtain adequate funding for it.
 
 
 [4]
 This conclusion does not rest on an estoppel theory. No reference outside of the 1943 agreement is necessary to establish that the Department of the Interior was obligated to seek funding for the undertakings agreed to in the contract. That obligation arises by implication from the language of the agreement. I thus do not believe that the line of decisions which have indicated that the government may not be estopped except possibly in the most extreme instances, e.g., Heckler v. Community Health Services of Crawford County, Inc., --- U.S. ----, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984), Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), are relevant to the proper resolution of plaintiffs' claims that are founded on the 1943 agreement