NATIONAL COMPANIES HEALTH BENEFIT PLAN, Trust Agreement for the National Companies Health Benefit Plan, Alfred A. Davis, in his capacity as Trustee, Michael C. Carlos, in his capacity as Trustee, Plaintiffs–Counterclaim defendants-Appellants,

v.

ST. JOSEPH'S HOSPITAL OF ATLANTA, INC., Defendant–Crossclaim defendant-Appellee,

Medical and Dental Plan, for employees of St. Joseph's Hospital of Atlanta, Inc., Defendant–Crossclaim defendant-Counterclaim plaintiff-Crossclaim plaintiff-Appellee,

Robert S. Hersh, Janet Hersh, individually and in their capacities as parents and legal guardians of Caitlyn Hersh, Jonathan Hersh, and Amanda Hersh, Amanda Hersh, Jonathan Hersh, and Caitlyn Hersh, Defendants–Counterclaim plaintiffs-Crossclaim plaintiffs-Crossclaim defendants-Appellees.

Robert S. HERSH, Janet Hersh, individually and in their capacities as parents and legal guardians of Caitlyn Hersh, Jonathan Hersh, and Amanda Hersh, Amanda Hersh, Jonathan Hersh, and Caitlyn Hersh, Plaintiffs–Appellees,

v.

NATIONAL DISTRIBUTING COMPANY, Defendant–Appellant.

No. 89–8932.

United States Court of Appeals, Eleventh Circuit.

April 30, 1991.

William H. Kitchens, Debra G. Buster, Arnall Golden & Gregory, Atlanta, Ga., for National Distributing Co.

Frederick L. Warren, William K. Carmichael, Stokes Lazarus & Carmichael, Atlanta, Ga., for Hersh.

William A. Clineburg, Jr., Michael E. Ross, King & Spalding, Atlanta, Ga., for St. Joseph's.

Before TJOFLAT, Chief Judge, FAY, Circuit Judge, and HOFFMAN *, Senior District Judge.

TJOFLAT, Chief Judge:

This appeal involves the continuation coverage provisions of the Employee Retirement Income Security Act of 1974 (ERISA)[1] and the principle of equitable estoppel. Robert Hersh, following his resignation from the National Distributing Company (NDC), elected to continue receiving group health coverage under NDC's ERISA plan; Mr. Hersh, before and after his resignation, was also covered under the ERISA group health plan of his wife's em-

ployer, St. Joseph's Hospital of Atlanta, Inc. (St. Joseph's). Several months after Mr. Hersh's resignation, Mrs. Hersh gave birth prematurely to twins; these babies required expensive medical care. Mr. Hersh submitted medical claims arising from the birth and care of the twins to NDC's ERISA plan. At that time, NDC informed Mr. Hersh that he was ineligible for continuation coverage under its plan, and his claims were denied; Mrs. Hersh's group health plan, claiming it was only a secondary insurer for Mr. Hersh and his dependents, also refused to compensate the Hershes fully for expenses arising from the birth and subsequent care of the twins.

To determine which group health plan was responsible for these medical claims, NDC's ERISA plan and its trustees (collectively, National) filed a declaratory judgment action against Robert and Janet Hersh, their children, and St. Joseph's and its group health plan; the Hershes also filed a separate suit against both group health plans. The district court, after consolidating the two actions, granted the Hershes' and St. Joseph's motions for summary judgment; the court denied National's motion for summary judgment. The court held that National was estopped from disclaiming an obligation to provide continuing group health coverage to the Hershes for a period of thirty-six months; the court also awarded the Hershes and St. Joseph's damages, attorneys' fees, and costs. National appeals from this summary judgment. We affirm.

## I.

In 1982, NDC established the National Companies Health Benefit Plan (the National Plan). Penn General Services of Georgia, Inc. (Penn General) helped NDC supervise and administer the National Plan. Under the National Plan, NDC functioned as a self-insurer by offering medical benefits directly to its employees and their dependents, rather than contracting with an insurance company to provide the bene-

---

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

1. 29 U.S.C. §§ 1001–1461 (1988).

fits under a group insurance policy. The National Plan is governed by ERISA.

Robert Hersh began working as a sales representative for NDC in January 1982. At that time, he enrolled in the National Plan and obtained individual coverage. In 1984, before the birth of his first child, Caitlyn, he acquired family health coverage for his wife and their future dependents. Janet Hersh, Robert's wife, was employed by St. Joseph's as a nurse; she was enrolled in the Medical and Dental Plan for Employees of St. Joseph's Hospital of Atlanta, Inc. (the St. Joseph's Plan), also an ERISA plan. Like her husband, Janet Hersh had individual coverage under her employer's plan until shortly before the birth of their first child, when she acquired family coverage. After Robert and Janet Hersh both had obtained family coverage, the National Plan served as the primary insurer for Mr. Hersh and their dependents, with the St. Joseph's Plan providing secondary coverage; the St. Joseph's Plan was the primary insurer for Mrs. Hersh only.[2]

In April 1986, Congress enacted the Comprehensive Omnibus Budget Reconciliation Act of 1986 (COBRA), Pub.L. No. 99–272, 100 Stat. 82,[3] which amended, *inter alia,* ERISA, the Public Health Service Act, and the Internal Revenue Code. COBRA, as explained fully *infra* pp. 1567–1568, required employers operating ERISA plans to offer "continuation coverage" under these plans to most of their employees after they left their jobs. COBRA provided that an employer must offer continuation coverage to most ex-employees for eighteen months; such coverage, however, could be terminated if the ex-employee became "a covered employee under any other group health plan." *Id.* § 10,002(a), 100 Stat. at 228 (codified at 29 U.S.C. § 1162). In October 1986, this provision of ERISA was amended to provide that employers could terminate an ex-employee's continuation coverage before the eighteen-month period expired if the ex-employee became "covered under any other group health plan (as an employee or otherwise)." Tax Reform Act of 1986 (Tax Reform Act), Pub.L. No. 99–514, § 1895(d)(4)(B)(ii), 100 Stat. 2085, 2938 (amending 29 U.S.C. § 1162). ERISA requires employers to notify employees of their rights to continuation coverage. 29 U.S.C. § 1166(a)(1).

In November 1986, NDC distributed a memorandum to its employees setting forth, in summary fashion, what it believed to be the employees' rights to continuation coverage under the National Plan.[4] This memorandum notified NDC employees and their families that COBRA applied to the National Plan beginning on November 1, 1986. The memorandum—summarizing the April 1986 version of ERISA, as amended by COBRA, rather than the October 1986 version of ERISA, as amended by the Tax Reform Act—explained the prerequisites for eligibility for continuation coverage and the events that might terminate such coverage. The terminating events, according to the memorandum, were

(1) The Company [NDC] ceases to provide any group health coverage to any of its employees;

(2) Your failure to pay the premium for your continuation coverage;

(3) You *become* an *employee covered under another group health plan;*

(4) You become eligible for Medicare;

(5) You are the widow of or are legally separated or divorced from a covered employee and subsequently remarry and are covered under your new spouse's group health plan.

(Emphasis added.) This memorandum instructed NDC employees to contact their managers if they had any questions about continuation coverage.

In the fall of 1986, Janet Hersh became pregnant with twins and, in December 1986, complications began to develop. Medical tests indicated that her pregnancy

---

**2.** This arrangement was specified in Mr. and Mrs. Hersh's contracts with their respective plans, and the plans coordinated payments on the Hershes' claims based on this arrangement.

**3.** This act also may be cited as the Comprehensive Omnibus Budget Reconciliation Act of 1985.

**4.** There is some evidence in the record that this memorandum was distributed in October 1986.

was likely to be a difficult one. During that time, Mr. Hersh was looking into the possibility of leaving NDC and starting his own business. Due to the problems they anticipated with Mrs. Hersh's pregnancy, the Hershes wanted to retain dual family health coverage. The Hershes contacted several insurance companies and inquired about rates, benefits, and whether these companies' programs would cover Mrs. Hersh's existing pregnancy. One insurance company stated that it would cover her pregnancy.

In January 1987, Robert Hersh informed NDC that he intended to resign and start his own business. He spoke with NDC's operations manager, Jerry Friedel, about continuing his insurance coverage under the National Plan; he informed Friedel of his desire to maintain dual family coverage. Friedel consulted with Kathy Boland (an NDC office clerk who handled benefit claims and forms and who was aware that Mr. Hersh was covered under the St. Joseph's Plan) and then told Mr. Hersh that he would be eligible for continuation coverage under the National Plan. The Hershes decided to continue their coverage under the National Plan after Mr. Hersh left NDC's employment.

On Robert Hersh's last day of work at NDC, January 30, 1987, he completed the National Plan's "Election and Terms Continuation Coverage Agreement." This agreement provided, in part:

I understand I am eligible to continue health coverage as presently provided under the [National Plan] for up to 36 months subject to the following provisions:

. . . .

3. Coverage will be terminated prior to the 36 month period for any of the following reasons:

a) Non-payment of premium by the covered person.

b) Becoming eligible for Medicare.

c) *Becoming covered* under another group health plan *because of either employment or remarriage.*

d) Termination of the Plan.

(Emphasis added.) An NDC employee filled out the form and Mr. Hersh signed and dated it; Mr. Hersh also tendered the first monthly premium payment at that time to Friedel.

Mr. Hersh continued to pay his monthly premium payments to the National Plan for several months; National accepted and deposited these checks. During this time, the Hershes submitted small claims for medical expenses to the National Plan for processing; most of these claims pertained to expenses incurred prior to Robert Hersh's resignation. One claim involved expenses incurred after Mr. Hersh's resignation; this claim was less than his deductible, and thus National did not issue a check to cover these expenses.

ERISA gives individuals sixty days from the date coverage under their ERISA plan ends either to choose or waive continuation coverage. On March 31, 1987, the Hershes' sixty-day election period ended with Mr. Hersh's election of continuation coverage intact. One week earlier, Mrs. Hersh had given birth to twins, Jonathan and Amanda, who were three months premature and required intensive medical care. Both babies suffered from intrauterine growth retardation and respiratory distress syndrome.

Following the birth of the Hersh twins, but before the Hershes submitted any claims for the medical expenses incurred in their births, Penn General—the administrator of the National Plan—employed Intracorp Medical Case Management Company (Intracorp), a medical claims investigator, to evaluate the medical condition of the twins, the medical care involved in treating them, and the potential costs of this care. Intracorp informed Penn General that the costs would likely be high.

In late April 1987, the Hershes submitted their first claims stemming from the birth of the twins to the National Plan and the St. Joseph's Plan for coordination and payment. These claims were well in excess of their deductible. While reviewing the claims, a claims processor for the National Plan noticed that Mr. Hersh was covered under the St. Joseph's Plan. In her opin-

ion, this meant that he was not entitled to continuation coverage under the National Plan. This was brought to the attention of Stuart Perry, the Vice President of Administration of Claims at Penn General, who recommended to Robert Schussel, NDC's vice president, that Mr. Hersh's policy be retroactively revoked to the date of his resignation and the Hershes' claims be denied. On May 13, 1987, Perry wrote Robert Hersh and informed him that the National Plan was denying all coverage retroactively to January 30, 1987. The National Plan forwarded all of the medical claims filed by the Hershes after January 30, 1987 that it had not already processed to the St. Joseph's Plan for processing.

The St. Joseph's Plan contended that the National Plan was still primarily responsible for Robert Hersh's and his dependents' medical claims and that the St. Joseph's Plan was only required to provide secondary coverage; the St. Joseph's Plan did accept primary responsibility for Janet Hersh's claims and made payment on them.[5] The National Plan attempted to refund the premium payments made by Mr. Hersh, plus ten percent interest; Mr. Hersh did not accept these refunds and continued to make the monthly premium payments to the National Plan.[6] Mr. Hersh believed throughout this time that he was entitled to continuation coverage under the National Plan.

On December 17, 1987, National filed a declaratory judgment action against St. Joseph's and the Hersh family in the District Court for the Northern District of Georgia seeking a declaration as to whether the National Plan or the St. Joseph's Plan was responsible for providing primary group medical coverage to Mr. Hersh and his dependents. National alleged that the National Plan was not required under ERISA, as amended by COBRA, to offer Robert Hersh or his dependents continuation coverage and that the St. Joseph's Plan was solely responsible for their health cover-

age. On December 31, 1987, the Hershes answered National's complaint, admitting only that a controversy over their insurance coverage existed. They also counterclaimed against National, alleging violations of ERISA and COBRA and breach of the continuation coverage agreement; additionally, they claimed that National was equitably estopped from denying coverage under the agreement. For these violations, the Hershes sought an award of all their medical expenses, with interest, plus an additional twenty-five percent as a penalty, reasonable attorneys' fees, and any other necessary relief. The Hershes also cross-claimed against St. Joseph's for violating its duty to provide them with insurance coverage; they asked for the same relief from St. Joseph's as they sought from National (minus the twenty-five percent penalty).

St. Joseph's, in its answer to National's complaint, denied primary responsibility for Mr. Hersh's and his dependents' coverage and asserted that National was barred from denying responsibility due to its negligence and under the equitable doctrines of estoppel, laches, and unclean hands. St. Joseph's also filed a counterclaim against National seeking contribution and reimbursement for the medical claims of the dependents of Mr. Hersh which St. Joseph's had paid, see supra note 5, and for which the National Plan was primarily liable. St. Joseph's, in its answer to the Hershes' cross-claim, denied liability for any claims not expressly covered under the St. Joseph's Plan and cross-claimed against the Hershes for contribution and reimbursement for all medical claims paid by the St. Joseph's Plan for which the National Plan was primarily responsible. In answer to St. Joseph's counterclaim and cross-claim, National and the Hershes, respectively, denied any liability.

Also on December 31, 1987, the Hershes filed a separate action against NDC in the

---

5. In an effort to relieve some of the burden on the Hershes, the St. Joseph's Plan agreed to pay a portion of the medical claims of her children on an interim basis until the disputed coverage issues were resolved.

6. In April 1988, National and the Hershes agreed that Mr. Hersh could stop making these premium payments without waiving any legal rights until the case was resolved.

District Court for the Northern District of Georgia. This complaint realleged the claims the Hershes raised against National in their counterclaim and sought the same relief. The court consolidated the actions brought by National and the Hershes, pursuant to Fed.R.Civ.P. 42(a).[7]

On August 8, 1988, all of the parties filed motions for summary judgment. The court, on December 20, 1988, entered a memorandum order granting the Hershes' and St. Joseph's motions for summary judgment and denying National's motion for summary judgment. The court first found that National was not required under ERISA or the National Plan to provide continuation coverage to Mr. Hersh and his dependents.[8] The court, however, held that National was equitably estopped from denying such coverage to the Hershes. The court pointed to several facts to support its conclusion: several NDC employees, who helped administer the National Plan, thought that ERISA did not require NDC to offer Robert Hersh continuation coverage under the National Plan because Janet Hersh maintained group health coverage under the St. Joseph's Plan; despite this knowledge, NDC offered Mr. Hersh continuation coverage under the National Plan, and this "error" was not corrected for four months; during those four months, Mr. Hersh paid premiums to the National Plan, and these payments were accepted; Mr. Hersh justifiably relied on both the continuation coverage summary NDC presented him and the continuation coverage agreement between him and the National Plan; due to Mr. Hersh's reasonable reliance on the representations made by National, the Hershes were damaged.

On May 8, 1989, the district court, after considering the recommendations of the parties, awarded attorneys' fees, pursuant to ERISA, in excess of $60,000 to both St. Joseph's and the Hershes. The court also held National liable for thirty-six months of coverage, pursuant to the terms of the agreement between National and Mr. Hersh. On October 27, 1989, the court entered final judgment against National, awarding damages to the Hershes and St. Joseph's, collectively, in excess of $1 million. National then appealed.

On appeal, National raises several issues. National first contends that ERISA did not require it to offer continuation coverage to Robert Hersh or his dependents because, after his resignation from NDC and the termination of his coverage under the National Plan, they were automatically covered under his wife's group health plan. This preexisting coverage allowed National summarily to terminate any continuation coverage Robert Hersh or his dependents may have been entitled to receive under ERISA. Thus, the St. Joseph's Plan, not the National Plan, is liable for the medical claims of the twins.[9]

National also argues that the district court erred in applying the doctrine of equitable estoppel to this case. National asserts that the law of this circuit prohibits the application of estoppel to effect informal modifications to an ERISA plan. Thus, the district court misapplied the law. Alternatively, National argues that if estoppel does apply, the district court erred in concluding that National was estopped from denying coverage in this case. National contends that two elements of estoppel are missing: there was no intentional

---

7. Fed.R.Civ.P. 42(a) provides:

 When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

8. This finding is implicit in the court's order. The court stated that "[h]ad National refused coverage upon receiving the application or ter-

minated it immediately after having a reasonable time to review the situation, even if its employee Mr. Friedel had represented that coverage would be given, the Court would have little trouble finding for National."

9. Furthermore, National argues that the Hersh twins "became covered" under the St. Joseph's Plan upon their birth; therefore, even if Robert Hersh is entitled to receive continuation coverage, the twins, by the terms of ERISA, are not entitled to continuation coverage under the National Plan.

deception or constructive fraud on its part and there was no detrimental reliance by the Hershes. Instead, National claims that it simply made an honest mistake amounting, at most, to negligence. Moreover, the Hershes suffered no injury because they continued to be covered under the St. Joseph's Plan, ensuring that their medical claims would be paid, and they saved the cost of premium payments to the National Plan.

Additionally, National contends that the district court erred in determining the damages awards.[10] National maintains that since the Hershes are also covered under the St. Joseph's Plan, there is little, if any, monetary harm to them. The award of over $1 million, therefore, is excessive. National also argues that the district court abused its discretion in awarding attorneys' fees; according to National, none of the factors used to determine the propriety of awarding attorneys' fees in ERISA actions are present in this case. Moreover, it asserts that the district court erroneously awarded the Hershes eighteen percent interest on outstanding bills due to Northside Hospital.

The appellees argue that Robert Hersh and his dependents are entitled to continuation coverage by the National Plan under ERISA. They assert that coverage under a preexisting group health plan did not constitute a terminating event under ERISA; thus, until Robert Hersh and his dependents acquired new insurance, the National Plan was obligated to provide coverage to them. Second, they contend that estoppel may be applied to this case. While they agree that estoppel cannot be used to modify an ERISA plan, they argue that this case involves the interpretation of a clause in an ERISA plan, and that estoppel may be used to bind an ERISA-plan provider to its interpretation of an ambiguous clause in the ERISA plan. Applying

the elements of estoppel to this case, they conclude that National is clearly estopped from denying coverage to the Hershes under the National Plan. Finally, they argue that the district court properly determined the damages awards and that the court did not abuse its discretion in awarding attorneys' fees and prejudgment interest of eighteen percent on the Northside Hospital's bills.

We agree with the district court's analysis of this case. First, we find that an ERISA provider is not required to offer continuation coverage to an employee or his dependents who are covered under a preexisting group health plan. Second, since continuation coverage is, by operation of law, part of every ERISA plan, an ERISA-plan sponsor's representations to its employees as to the meaning of CO-BRA's and the Tax Reform Act's amendments to ERISA is an interpretation of a provision of the plan itself. Thus, if the ERISA provider misinforms its employee about his rights to continuation coverage, and the employee relies on that misinformation to his detriment, the provider will be held liable under the equitable doctrine of estoppel. We find that the elements of estoppel have been satisfied; accordingly, we affirm the district court's conclusion that National is liable to Robert Hersh and his dependents for continuation coverage and for claims that arose after Robert Hersh's resignation from NDC, including medical claims associated with the care and treatment of the twins. Finally, we affirm the district court's awards of damages, attorneys' fees, and prejudgment interest.

## II.

We organize this opinion as follows. First, in subpart A, we discuss Robert Hersh's eligibility for continuation coverage under ERISA.[11] Second, in subpart B,

---

10. National does not appeal the district court's award of injunctive relief, which requires National to provide Robert Hersh and his dependents with thirty-six months of coverage, starting from the date of Mr. Hersh's resignation from NDC, under the National Plan.

11. Our resolution of this issue applies equally to Robert Hersh's dependents' eligibility for continuation coverage under ERISA. For ease of discussion, we refer only to Robert Hersh's eligibility throughout the opinion. Given our conclusion in part II.A, it is unnecessary for us to decide whether the twins became covered under

we discuss the application of equitable estoppel to this case. Finally, in subpart C, we address the validity of the district court's awards of damages, attorneys' fees, and prejudgment interest.

### A.

 As stated above, Congress passed COBRA in 1986. This legislation was designed to address the "staggering budget deficits now facing the United States." S.Rep. No. 146, 99th Cong., 2d Sess. 3, *reprinted in* 1986 U.S.Code Cong. & Admin.News 42, 43. The COBRA amendments to ERISA were enacted in response to "reports of the growing number of Americans without any health insurance coverage and the decreasing willingness of our Nation's hospitals to provide care to those who cannot afford to pay." H.R. Rep. No. 241, 99th Cong., 2d Sess. 44, *reprinted in* 1986 U.S.Code Cong. & Admin.News 579, 622. To help remedy this problem, Congress amended ERISA to require all plan sponsors of group health plans to provide continuation coverage under their plans. 29 U.S.C. § 1161(a).[12]

Continuation coverage is available to "qualified beneficiar[ies]"; qualified beneficiaries include employees and their spouses and dependents, as well as some retirees and widows. *Id.* § 1167(3). In order for a qualified beneficiary to receive continuation coverage, one of several "qualifying event[s]" must occur. These include:

(1) The death of the covered employee.

(2) The termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment.

(3) The divorce or legal separation of the covered employee from the employee's spouse.

*Id.* § 1163.

Once it is determined that continuation coverage is available to a particular individual and that a qualifying event has occurred, the qualified beneficiary has, at a minimum, sixty days to choose such coverage under his previous plan. *Id.* § 1165. This continuation coverage "must consist of coverage which, as of the time the coverage is being provided, is identical to the coverage provided under the plan to sim-

---

the St. Joseph's Plan after birth, and, thus, are ineligible for continuation coverage under the National Plan.

**12.** Jefferson–Pilot Life Insurance Company (Jefferson), NDC's reinsurer or reimburser for all losses suffered by the National Plan in excess of $40,000, argues, in its amicus curiae brief, that continuation coverage is not mandatory. Instead, Jefferson contends that ERISA plans may choose whether to provide continuation coverage and that a plan's failure to provide such coverage simply results in a loss of tax benefits, principally the denial of certain deductions. Furthermore, Jefferson, relying on ERISA's civil enforcement provision, 29 U.S.C. § 1132, argues that a beneficiary can bring a civil action only to enforce the specific terms of his plan; thus, it argues, since continuation coverage was not incorporated explicitly into the National Plan at the time of Robert Hersh's resignation, he cannot bring this suit.

These arguments are patently wrong. First, the plain language of ERISA, as amended by COBRA, makes it clear that continuation coverage is mandatory. ERISA provides that "[t]he plan sponsor ... *shall provide* ... continuation coverage under the plan," 29 U.S.C. § 1161(a) (emphasis added); therefore, by operation of law, COBRA amended every ERISA plan, providing for continuation coverage. Jefferson's

emphasis on the tax ramifications of failing to provide continuation coverage is misplaced. That an ERISA-plan sponsor may lose tax benefits if it fails to provide continuation coverage does not demonstrate that the provision of continuation coverage is optional for ERISA plans. Congress clearly intended to create a dual enforcement mechanism; indeed, both the House of Representatives and the Senate proposed legislation, which was eventually coordinated by a joint conference committee, to provide for both a denial of tax deductions and civil suits for a failure to provide continuation coverage. *See* Joint Comm. on Comprehensive Omnibus Reconciliation Act of 1985, H.R.Rep. No. 453, 99th Cong., 1st Sess., 561–63 (1985) (describing House and Senate amendments to COBRA and agreement reached by Congress). This mechanism heightens enforcement of COBRA's amendments to ERISA and aids Congress in fully realizing its goals.

Second, ERISA provides that "[a] civil action may be brought ... by a participant, beneficiary, or fiduciary ... to obtain ... appropriate equitable relief ... *to enforce any provisions of this subchapter or* the terms of the plan." 29 U.S.C. § 1132(a) (emphasis added). Thus, a plan sponsor is subject to a civil suit for failing to include in the plan any mandatory provision of subchapter I of ERISA, such as continuation coverage.

**1568**

ilarly situated beneficiaries under the plan with respect to whom a qualifying event has not occurred." *Id.* § 1162(1). The maximum length of time a plan must provide continuation coverage to employees who are terminated or suffer reduced hours is eighteen months from the date of the qualifying event, *id.* § 1162(2)(A)(i); in cases involving other qualifying events, the maximum length of time is generally thirty-six months from the date of the qualifying event, *id.* § 1162(2)(A)(ii)–(v). Continuation coverage may be terminated for reasons other than the expiration of these time periods. For example, continuation coverage may be terminated if the employer ceases to provide any group health plan to any employee, *id.* § 1162(2)(B), or if the premium payments for the qualified beneficiary's coverage are untimely, *id.* § 1162(2)(C).

At issue in this case is the provision in ERISA which allows an employer to terminate continuation coverage due to "[g]roup health plan coverage." *Id.* § 1162(2)(D). Originally, as noted *supra* p. 1562, this provision stated that an employer could terminate continuation coverage on the date on which the qualified beneficiary first became, "after the date of election[,] ... a covered employee under any other group health plan." COBRA, Pub.L. No. 99–272, § 10,002(a), 100 Stat. 82, 228. Then, in October 1986, Congress amended this section to allow termination of continuation coverage when the qualified beneficiary first became, "after the date of election, covered under any other group health plan (as an employee or otherwise)." Tax Reform Act, Pub.L. No. 99–514, § 1895(d)(4)(B)(ii), 100 Stat. 2085, 2938. Finally, Congress amended this section in 1989 to provide that an employer may terminate continuation coverage when the qualified beneficiary first becomes covered as an employee or otherwise by a group health plan "which does not contain any exclusion or limitation with respect to any prexisting condition of such beneficiary." Omnibus Budget Reconciliation Act of 1989, Pub.L. No. 101–239, § 7862(c)(3)(B)(ii), 103 Stat. 2106, 2432.

■ The active provision at the time Mr. Hersh resigned from NDC was that found in the October 1986 version of ERISA. The specific question before us is whether Mr. Hersh's coverage, prior to and after his resignation from NDC, under Mrs. Hersh's group health plan allowed National to terminate his continuation coverage immediately; in other words, does the existence of the preexisting group health coverage make Mr. Hersh effectively ineligible for continuation coverage under ERISA? We hold that it does.

Two circuit courts of appeals have considered this basic question. In *Oakley v. City of Longmont,* 890 F.2d 1128 (10th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990), the Tenth Circuit analyzed COBRA's amendments to the Public Health Service Act (PHSA), 42 U.S.C. §§ 201 to 300aaa–13 (1988), ERISA's statutory counterpart governing group health plans for certain state and local employees; the language at issue in *Oakley* is identical to that at issue in this case. The plaintiff, Oakley, was a fire fighter for the City of Longmont, and was covered under both his employer's PHSA group health plan and his wife's group health plan. Oakley was involved in an automobile collision and suffered a permanent head injury; subsequently he was terminated from his position as a fire fighter. The city informed Oakley that he was not eligible for continuation coverage under its PHSA plan because he already was covered under his wife's insurance plan. His wife's plan, however, unlike the city's plan, did not cover the costs of rehabilitation therapy for his brain injury.

The Tenth Circuit held that an employee's coverage under his spouse's preexisting group health plan does not permit a PHSA plan sponsor to terminate, or refuse to offer, continuation coverage under its plan. *Id.* at 1132. The court concluded that the phrase "first becomes after the date of the election ... covered," found in both the PHSA and ERISA, limits the terminating provision at issue to cases where group health coverage is acquired after an employee resigned from his job. *Id.* Thus, this provision did not apply to an employee

who was covered by his wife's group health plan prior to his resignation; that employee first became covered prior to his election of continuation coverage. *Id.* The court further determined, based on its reading of the legislative history, that the language at issue—"as an employee or otherwise"—refers only to subsequent events relating to the employee's own employment or marital status. *Id.* Therefore, continuation coverage can only be terminated if the employee becomes covered under another group health plan because of new employment, reemployment, or remarriage. *Id.*

Additionally, the Tenth Circuit, in dicta, noted that there was a "gap" between Oakley's coverage under the city's plan and his coverage under his wife's plan. This gap illustrated the precise problem that troubled Congress and led to the enactment of COBRA; forcing Oakley's family to finance the treatment of his catastrophic injury would put both Oakley and his family at risk. *Id.* at 1133. Thus, the court stated that, in such a situation, Congress must have intended continuation coverage to remain available despite the existence of other coverage.

The Fifth Circuit, in *Brock v. Primedica, Inc.*, 904 F.2d 295 (5th Cir.1990), purportedly relied on the analysis in *Oakley;* the court, however, concluded that the plaintiff was not entitled to continuation coverage under ERISA. As in *Oakley*, the plaintiff, Brock, was covered by both her employer's and her spouse's group health plans. After resigning from her job, Brock elected to continue her coverage under her employer's plan; subsequently she submitted claims for medical expenses incurred after her resignation. The plan denied her claims, citing her ineligibility for continuation coverage, and refunded her premiums. Brock sued to compel her employer to honor her claims.

The Fifth Circuit, relying on dicta, read *Oakley* to hold that an employee is entitled to continuation coverage under her previous employer's plan if there is a significant gap in the coverage provided to the employee under her spouse's plan as compared with the employer's plan. In support of this proposition, the Fifth Circuit noted that ten days after the *Oakley* decision was issued, Congress enacted the 1989 amendments to ERISA, providing eligibility for continuation coverage until the qualified beneficiary becomes "covered under any group health plan (as an employee or otherwise) *which does not contain any exclusion or limitation with respect to any preexisting condition of such beneficiary.*" *Id.* at 297 (emphasis added) (quoting 29 U.S.C. § 1162(2)(D)(i)). This amendment, like the *Oakley* dicta, emphasizes the importance of the character of the coverage obtained by the beneficiary. The court, to resolve Brock's case, thus compared her preexisting coverage to her previous ERISA coverage. The court concluded that, unlike in *Oakley*, there was no gap in Brock's coverage; the medical problem for which she had made a claim was covered under both her previous employer's ERISA plan and her husband's group health plan. Accordingly, the court concluded, Brock was not entitled to continuation coverage under her previous employer's plan.

We do not share the Fifth Circuit's belief that *Oakley* and *Brock* endorse the same general rule—that eligibility for continuation coverage, under either ERISA or PHSA, depends on the character of the coverage at issue. Instead, we view these cases as taking dramatically different stands on the same issue. The Tenth Circuit held in *Oakley* that preexisting group health coverage does not render an employee ineligible for continuation coverage; the Fifth Circuit, citing *Oakley's* dicta, held that, in the absence of a gap in coverage, the opposite was true. We agree with the approach taken by the Fifth Circuit.

Congress enacted COBRA because it was concerned about the fate of individuals who, after losing coverage under their employer's ERISA plan, had no group health coverage at all. Continuation coverage would afford these individuals group health coverage until they were able to secure some other coverage. Recognizing the substantial costs continuation coverage would place on employer-operated ERISA plans, and thus beneficiaries of these plans,

Congress did not make continuation coverage infinite in duration. Instead, Congress, under ERISA, gave beneficiaries a maximum period of either eighteen or thirty-six months of continuation coverage, a reasonable length of time for most beneficiaries to secure other group health coverage.

Additionally, Congress provided for certain terminating events. One such event is the beneficiary's obtention of other group health coverage. This provision is consistent with the goals of COBRA. Some beneficiaries are able to obtain new group health coverage in less than eighteen or thirty-six months. When these individuals obtain their new coverage, coverage under their former ERISA plan is unnecessary. In these cases, Congress' goal has been served—the employee has group health coverage. Thus, Congress created the terminating event at issue here—"[t]he date on which the qualified beneficiary first becomes, after the date of election[,] covered under any other group health plan (as an employee or otherwise)"—to permit employers to terminate continuation coverage whenever an employee receiving such coverage was protected by another group health plan, and, thus, did not need continuation coverage. This clearly includes employees covered under their spouses' preexisting group health plans. In such a setting, the concerns that motivated Congress' enactment of COBRA generally are not present; the employee has group health coverage.

In our opinion, the Tenth Circuit has erroneously restricted the phrase "first becomes, after the date of election ... covered," found in ERISA's and the PHSA's continuation coverage termination provision; this language may be interpreted to more faithfully implement the intentions of Congress. Congress was concerned with the lack of group health coverage after an employee left his job; therefore, the relevant time period is that following his continuation-coverage election. In applying the termination provision at issue, then, it is clearly irrelevant whether an employee had other group health coverage prior to this election date—an employer cannot refuse to offer continuation coverage to a former employee simply because that ex-employee had other group health coverage during his employment. Instead, Congress allowed ERISA-plan sponsors to terminate continuation coverage only on the first date after the election date that the employee became covered under another group health plan. Thus, it is immaterial when the employee acquires other group health coverage; the only relevant question is when, after the election date, does that other coverage take effect. In the case of an employee covered by preexisting group health coverage, the terminating event occurs immediately; the first time after the election date that the employee becomes covered by a group health plan other than the employer's plan is the moment after the election date. In effect, such an employee is ineligible for continuation coverage.

Additionally, the Tenth Circuit incorrectly translated the phrase "as an employee or otherwise" to mean due to reemployment or remarriage. This translation is not supported by the plain language of ERISA or the legislative history of the Act that supplied this phrase—the Tax Reform Act. The Tenth Circuit relied solely on the legislative history of COBRA. The plain language of COBRA, and thus the first version of ERISA's (and the PHSA's) "other coverage" termination provision, limits, in part, the right of employers to terminate continuation coverage to cases when employees obtain other group health coverage because of reemployment or remarriage. It is not surprising, then, that the Tenth Circuit found that the legislative history of COBRA supported its position. What the Tenth Circuit neglected to note, however, is that Congress removed this limitation in the Tax Reform Act; the court did not distinguish, or even discuss, that Act's language. In the Tax Reform Act, Congress described its amendment to ERISA's "other coverage" termination provision as providing for the "[t]ermination of continuation coverage upon coverage by [an]other group health plan *rather* than upon reemployment or remarriage." Tax Reform

Act, Pub.L. No. 99–514, § 1895(d)(4), 100 Stat. 2085, 2938 (emphasis added). Thus, it appears that Congress intended that the obtention, in any manner, of almost any group health coverage would justify an ERISA-plan sponsor's termination of continuation coverage, and that Congress amended ERISA to effectuate this intent. In the absence of a clear expression by Congress contrary to this position, we will not follow the Tenth Circuit's lead in limiting the plainly expansive language of ERISA.

■ There may be, however, instances when, despite coverage under a preexisting group health plan, an employee is entitled to receive continuation coverage under his previous employer's ERISA plan. If there is a significant gap between the coverage afforded under his employer's plan and his preexisting plan, an employee will be eligible for continuation coverage. This is because, in that situation, the employee is not truly "covered" by the preexisting group health plan, as that term is used by Congress to effectuate its intent; the employee, despite his other coverage, will be liable personally for substantial medical expenses to his and his family's detriment. Denying continuation coverage in that setting would serve to frustrate, rather than foster, Congress' clear intentions.

In the present case, there is no significant gap in the coverage; under both the National Plan and the St. Joseph's Plan, the Hershes are covered for most medical expenses arising out of the birth of the twins. The Hershes are personally responsible for approximately $6,700 of medical expenses. This responsibility arises, however, because they lack dual coverage, not because the St. Joseph's Plan is inadequate; coverage under the National Plan alone would not put the Hershes in any better position. Accordingly, we hold that Robert Hersh is not entitled to continuation coverage under ERISA.

### B.

The appellees contend that, even if National is not required to offer Mr. Hersh or his dependents continuation coverage un-

der the National Plan, it is estopped from denying such coverage. The district court, accepting this position, entered summary judgment against National. We agree with the district court's resolution of this issue.

■ ERISA preempts all state common-law claims relating to employee benefit plans, including equitable estoppel claims. *See* 29 U.S.C. § 1144(a); *Kane v. Aetna Life Ins.*, 893 F.2d 1283, 1285 (11th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990). "Federal courts possess the authority, however, to develop a body of federal common law to govern issues in ERISA actions not covered by the act itself." *Kane*, 893 F.2d at 1285. In *Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir.1986), this court held that the federal common-law claim of equitable estoppel is not available to plaintiffs in cases involving oral amendments to or modifications of clear terms of employee benefit plans governed by ERISA. The court reasoned that "[b]y explicitly requiring [in 29 U.S.C. § 1102(b)(3) ] that each [ERISA] plan specify the ... procedures [to amend the plan], Congress rejected the use of informal written agreements to modify an ERISA plan." *Id.* Thus, a federal court could not create federal common law to apply to these issues. *Id.* This rule safeguards ERISA's underlying policy of protecting the interests of employees and their beneficiaries in employee benefit plans; allowing informal written or oral amendments to a plan would make it impossible for employees to rely on these plans because their benefits could be radically affected by funds dispersed to others pursuant to these informal agreements.

■ In *Kane*, 893 F.2d at 1283, this court further clarified the scope of the holding in *Nachwalter*, "differentiat[ing] between oral amendments or modifications to a plan and oral *interpretations* of a plan." *Alday v. Container Corp. of Am.*, 906 F.2d 660, 666 (11th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 675, 112 L.Ed.2d 668 (1990). The court held that the federal common-law claim of equitable estoppel may be applied when an employee relies, to his detriment, on an interpretation of an

ambiguous provision in a plan by a representative of that plan. *Kane*, 893 F.2d at 1286. An ambiguous provision is one about which "reasonable persons could disagree as to [its] meaning and effect." *Id.* at 1285. The court concluded that requiring ERISA plan sponsors to adhere to their representatives' oral interpretations of the plan would not affect the ability of employees and beneficiaries to rely on the written terms of such plans. *Id.* at 1286. The rationale of *Kane* is equally applicable to informal written interpretations of an ERISA plan. As with oral interpretations, ERISA does not specifically address the issue of informal written interpretations of a plan, and use of the law of equitable estoppel to enforce informal written interpretations will not undermine the integrity of ERISA plans.

 At issue in this case are oral and informal written interpretations of ERISA's continuation coverage provision. As stated *supra* note 12, continuation coverage became, by operation of law, a part of every ERISA plan. Thus, this case involves interpretations of ambiguous provisions of an ERISA plan; the meaning and effect of COBRA's and the Tax Reform Act's amendments to ERISA is something about which reasonable persons can differ. Accordingly, the federal common-law claim of equitable estoppel may be applied to this case.[13]

 The elements of equitable estoppel, as defined by federal common law, are: (1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation. *See Heckler v. Community Health Servs., Inc.*, 467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984); *Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210, 1217 (6th Cir.), *cert. denied*, 484 U.S. 820, 108 S.Ct. 77, 98 L.Ed.2d 40 (1987).[14]

---

**13.** We are mindful of the rule that "estoppel may not be invoked to enlarge or extend the coverage specified in a contract." *Kane*, 893 F.2d at 1285 n. 3. National argues that the district court's application of estoppel in this case did just that; it contends that Mr. Hersh and his dependents are not eligible to receive continuation coverage, and that by estopping National from denying such coverage, the district court "created a right that did not otherwise exist." The *Kane* court, in rejecting such an argument, concluded that

[t]he rule ... does not apply to the facts of this case, because the application of equitable estoppel will not result in an extension or enlargement of the benefits available under the Plan. The representations made by [the Plan's administrator] amounted to an interpretation of an ambiguous provision of the Plan, not an extension of coverage beyond that specified in the Plan.

*Id.* We agree with the *Kane* court's position, and, accordingly, reject National's argument.

**14.** There are several different ways to recapitulate the elements of the federal common-law claim of equitable estoppel. We have only recounted the general principles upon which this claim is based. National cites *Zittrouer v. Uarco Inc. Group Benefit Plan*, 582 F.Supp. 1471, 1475 (N.D.Ga.1984), for the proposition that estoppel, under federal common law, requires "an intentional deception through concealment or inaction, or gross negligence amounting to constructive fraud." It claims that this demonstrates that the district court used an inappropriate standard for evaluating the estoppel claim, one that is easier to satisfy. The *Zittrouer* test, however, is simply a reformulation of traditional estoppel principles, and is used for estoppel claims involving material omissions rather than misrepresentations; any difference between this test and the district court's (and our) test is insignificant.

In *Zittrouer*, the plaintiff sued Uarco Inc.'s ERISA plan (Uarco) for refusing to provide her certain benefits. Uarco contended that the plaintiff was ineligible for these benefits under the express terms of the plan. The plaintiff, however, claimed that Uarco had failed to explain these terms in the plan summary it issued. The plaintiff asserted that she justifiably had relied on this plan summary, to her detriment, and, thus, Uarco, because of its material omission, should be estopped from denying her benefits. Uarco moved for summary judgment on this claim; the district court denied this motion. The district court found that Uarco's failure to include the relevant terms in its plan summary was "at best gross negligence and at worst intentional deception through concealment or inaction." *Id.* The court concluded that the doctrine of estoppel was applicable to the case; it found all but one element of estoppel clearly to

We agree with the district court's conclusion that these elements have been met.

First, NDC misrepresented to Mr. Hersh that he was entitled to and would receive continuation coverage under the National Plan. NDC made these representations in its memorandum explaining continuation coverage under the National Plan, through Jerry Friedel, the NDC operations manager who told Mr. Hersh that he would be entitled to continuation coverage, and in the continuation coverage agreement Mr. Hersh signed on the day he resigned from NDC. Furthermore, by accepting Mr. Hersh's premium payments for four months, NDC continually assured Mr. Hersh that the National Plan was providing him with group health coverage.

Second, the record establishes that representatives of NDC and Penn General—the administrator of the National Plan—knew or believed, before Robert Hersh resigned from NDC, that he was ineligible for continuation coverage under the National Plan because of his preexisting coverage under the St. Joseph's Plan. For example, Stuart Perry, the Vice President of Administration of Claims at Penn General, testified in deposition that he was aware, prior to Mr. Hersh's resignation from NDC, that "if Mrs. Hersh did not drop her coverage by the end of the 60–day waiting period, Mr. Hersh's [continuation] coverage would have been invalidated." Furthermore, Kathy Boland, an NDC office clerk who handled claims and forms, testified in deposition that her belief that an ex-employee who was covered under his spouse's preexisting group health plan was ineligible for continuation coverage under ERISA existed from "the onset, the original COBRA plan." [15]

The third element of estoppel is clearly satisfied. Part of the stated policy of ERISA is to protect participants and beneficiaries in employee benefit plans by "requiring the disclosure and reporting to participants and beneficiaries ... information" concerning ERISA. 29 U.S.C. § 1001(b). To effectuate this policy, ERISA requires plan sponsors to furnish participants and beneficiaries of the plan with summary plan descriptions. Id. § 1022(a)(1). Additionally, ERISA plans must notify employees and their spouses, in writing, of their rights with respect to continuation coverage. Id. § 1166(a)(1). These provisions are designed to provide individuals with reliable sources of information from which

exist, reserving judgment on the issue of damages for further factual development.

Most estoppel cases involve parties' active misrepresentations of material facts; *Zittrouer*, however, involved a party's failure to make representations concerning material facts. Thus, the district court, in formulating a test, presented the traditional principles underlying estoppel claims differently than we do. It would have made no sense for the *Zittrouer* court to examine whether Uarco had misrepresented a material fact; Uarco had made no representation at all. Instead, the district court looked for an intentional deception through concealment. This test is equivalent to that used in estoppel cases involving misstatements of fact, such as this one; courts look, in effect, for an intentional deception through misrepresentation—a party who, knowing the truth, misrepresents material facts.

Indeed, tracing the root of the *Zittrouer* test exposes this very point. *Zittrouer* cites dicta in *In re Henderson*, 577 F.2d 997 (5th Cir.1978), as the source of its test. *Henderson*, in turn, cites three cases that describe the elements of estoppel as we do in the text. *See Minerals & Chems. Philipp Corp. v. Milwhite Co.*, 414 F.2d 428, 430 (5th Cir.1969); *Gullett v. Best Shell Homes, Inc.*, 312 F.2d 58, 61 n. 2 (5th Cir.1963); *Bituminous Trucking & Equip. Co. v. Delta Air Lines*, 189 F.2d 307, 310 (7th Cir.1951). For example, the court in *Gullett* stated:

> The essential elements of estoppel are conduct and acts, language or silence, amounting to a representation or concealment of material facts, with knowledge or imputed knowledge of such facts, with the intent that representation or silence, or concealment be relied upon, with the other party's ignorance of the true facts, and reliance to his damage upon the representation or silence.

(quoting *Crowe v. Fotiades*, 224 Miss. 422, 80 So.2d 478, 486 (1955)). Thus, the district court did not err in applying the test we set out above.

**15.** Additionally, even if NDC and Penn General did not actually know, prior to Robert Hersh's resignation, that, due to his preexisting group health coverage, he was ineligible for continuation coverage, NDC, as an ERISA-plan sponsor, is charged with knowledge of every provision of ERISA. Indeed, NDC is obligated, under ERISA, to determine employees' rights to continuation coverage and notify them of these rights. 29 U.S.C. § 1166(a)(1). This constructive knowledge satisfies this element of the estoppel claim.

they can learn about their rights under their employee benefit plans. Mr. Hersh relied on NDC's memorandum notifying him of his rights with respect to continuation coverage; he also relied on the representations made to him by NDC in the continuation coverage agreement he signed. Such reliance is encouraged by ERISA and, hence, was clearly reasonable. Furthermore, Mr. Hersh was specifically told, in NDC's memorandum describing continuation coverage, that any additional inquiries should be directed to his manager. Thus, his reliance on Friedel's representations was also justified.

The remaining elements of estoppel are also present. Neither party contends that Robert Hersh knew that he was not entitled to continuation coverage; thus, he was unaware of the true facts. Finally, the Hershes, in reliance on NDC's representations, curtailed their search for other insurance companies that might have been able to provide them with group health coverage. The record shows that the Hershes had, in fact, found another insurance company willing to cover Janet Hersh's existing pregnancy, but that the Hershes, after learning that they would be entitled to continuation coverage under the National Plan, decided not to enter into a contract with this other insurer.

■ National argues that the Hershes did not suffer any damage as a result of not being covered under the National Plan. It contends that the Hershes remained covered under the St. Joseph's Plan, and that the St. Joseph's Plan should have paid for the medical expenses they incurred from the birth and care of the twins. Therefore, National concludes, there was no detrimental reliance by the Hershes, and equitable estoppel does not apply. The record, however, does not support this argument. As National concedes in its brief to us, the record establishes that, absent dual coverage, the Hershes will be responsible for approximately $6,700 of medical expenses; the St. Joseph's Plan alone will not cover these expenses. If the Hershes had obtained other coverage, thereby maintaining dual coverage, they would not have to pay this amount.[16] Thus, the Hershes have detrimentally relied on the representations of NDC. Therefore, we hold that NDC is estopped from denying liability to the Hershes.

## C.

National argues that the district court applied the wrong damage measure, and that this resulted in excessive damages awards for the Hershes and St. Joseph's. It contends that the court simply should have put the Hershes in the position they would have been in before its breach of the continuation coverage agreement. Since the Hershes' detrimental reliance only cost them a few thousand dollars, it argues, this amount is the proper damages awards; the district court's awards of over $1 million is erroneous because the St. Joseph's Plan would cover these additional expenses. We disagree.

■ National ignores the fact that the district court held it liable for thirty-six months of group health plan coverage to Mr. Hersh and his dependents, pursuant to their continuation coverage agreement; National did not appeal the district court's award of injunctive relief.[17] Accordingly, the National Plan is required to resume its role as the primary insurer for Mr. Hersh and his children; the St. Joseph's Plan continues to serve only as their secondary insurer. The Hershes had substantial unpaid medical expenses arising from the birth and care of their twins; furthermore, the St. Joseph's Plan had covered part of the Hershes' medical expenses, and had sued the National Plan for reimbursement.

---

16. The record establishes that even after subtracting from this amount the money the Hershes saved, or would have saved, by not having to pay the National Plan's premiums, they would still owe money for medical expenses incurred in the birth and care of the twins. Thus, there would still be detrimental reliance.

17. In fact, National only argued to the district court that it was liable for eighteen months, rather than thirty-six months, of coverage to Robert Hersh and his dependents; National did not argue to the district court that such relief was unavailable to the Hershes.

The damages awards by the district court equal these expenses. National does not contend that the damages awards inaccurately reflect its liability as Mr. Hersh and his children's primary insurer. Indeed, National stipulated to this figure, and the district court simply adopted that stipulation as its damages awards. Thus, in light of the uncontested injunctive relief against National, its argument regarding the damages awards must fail.

 National also disputes the district court's award of attorneys' fees. ERISA provides that "[i]n any action under this subchapter ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). Our predecessor court promulgated guidelines to help district courts exercise their discretion in this area. *Iron Workers Local No. 272 v. Bowen,* 624 F.2d 1255, 1266 (5th Cir.1980).[18] The "nuclei of concerns" a court should consider in deciding whether to award attorneys' fees under ERISA are:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.

*Id.* (footnote omitted). "No one of these factors is necessarily decisive, and some may not be apropos in a given case." *Id.* We will only reverse the district court's

decision if there has been a clear abuse of discretion. *Dixon v. Seafarers' Welfare Plan,* 878 F.2d 1411, 1412 (11th Cir.1989) (per curiam). After analyzing these factors, we affirm the district court's conclusion.

The district court found that National had acted in bad faith. National contends that, at most, it made an honest mistake in its interpretation of ERISA's continuation coverage termination provision. National, however, ignores the basis of the district court's summary judgment. This is not a case in which the employer initially refused to provide continuation coverage based on its interpretation of ERISA. Instead, National represented to Mr. Hersh that it would provide continuation coverage to him and then, after Mr. Hersh had detrimentally relied upon this representation, National changed its mind and tried to avoid its obligation. Thus, it is immaterial whether NDC acted in good faith in its initial interpretation of ERISA;[19] National's attempt to avoid its obligation demonstrates its bad faith.

National concedes that it is better able to satisfy an award of attorneys' fees than the Hershes; its ability to do so is equal to that of St. Joseph's. Additionally, we agree with the district court that the deterrent value of an award of attorneys' fees in this case is high. If National did not have to pay the appellees' attorneys' fees, it would only be liable for what it should have covered before this litigation commenced. With nothing to lose but their own litigation costs, other ERISA-plan sponsors might find it worthwhile to force underfinanced beneficiaries to sue them to gain their benefits or accept undervalued settlements. Assessing attorneys' fees against National will make it, and other

---

18. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

19. NDC's contention that it acted in good faith, or at most negligently, in its interpretation of ERISA's continuation coverage termination provision is questionable. The record demonstrates that NDC was aware of the Tax Reform

Act's amendments to ERISA and believed that they made Mr. Hersh ineligible for continuation coverage under ERISA. NDC, however, failed to explain to Mr. Hersh, prior to his resignation, the import of these amendments. Thus, NDC did not simply make an honest mistake in its interpretation of ERISA; it correctly interpreted the Tax Reform Act's amendment to ERISA's continuation coverage provision but failed to notify Mr. Hersh of this amendment.

ERISA-plan sponsors, less likely to make representations to beneficiaries concerning their group health coverage and then to attempt to renege on their obligations; furthermore, ERISA-plan sponsors will be motivated to inform beneficiaries quickly of their rights when Congress amends ERISA.

We agree with the district court that National, by bringing its declaratory judgment action, sought to resolve a significant legal question regarding ERISA, and that this factor does not weigh in favor of the Hershes and St. Joseph's. Of course, by contesting National's position prior to this action and forcing its hand, the Hershes and St. Joseph's did play an integral part in the process that led to the resolution of an important issue concerning ERISA. *See Nachwalter*, 805 F.2d at 962 n. 8 ("The fact that appellees brought this suit as a declaratory judgment action instead of waiting for appellant to sue to enforce the oral agreement in a coercive suit suggests that appellees also thought that appellant's claim was not frivolous and that it presented an unresolved legal question.").[20] Finally, as our disposition of the case indicates, we clearly agree with the district court that the appellees' positions are the most meritorious, although our discussion in part II.A comports generally with National's position.

Considering all of these factors, we cannot conclude that the district court clearly abused its discretion in awarding the Hershes and St. Joseph's attorneys' fees. Most, if not all, of the *Bowen* factors weigh in favor of the appellees. Accordingly, we affirm the district court's awards of attorneys' fees.

The last argument National makes is that the district court abused its discretion in awarding the Hershes eighteen percent per annum interest for the outstanding bills due to Northside Hospital. It contends that Northside Hospital's account statements did not specify, prior to trial, an eighteen percent per annum interest rate, as would be required for the Hershes to recover that amount of interest, and that the Hershes only prayed for the statutory interest rate of seven percent.

 National's position misrepresents the record. On December 1, 1987, two weeks before National filed its declaratory judgment action, Northside Hospital sent a letter to the Hershes notifying them that it sought interest at the rate of one and one-half percent per month, pursuant to Ga. Code Ann. § 7-4-16 (1989), for their unpaid bills; this equals eighteen percent per annum. Copies of this letter were apparently sent to National's counsel. The district court, in awarding the Hershes the interest they sought, simply gave them the amount of interest Northside Hospital was charging them. We conclude that this was not an abuse of the court's discretion.

### III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

**20.** National claims that the district court's opinion left open the question whether preexisting group health coverage makes an employee ineligible for continuation coverage under ERISA. Thus, it argues, this case only benefits the Hershes and St. Joseph's and is not the type for which attorneys' fees should be awarded. As we, however, point out, *supra* p. 1565 & note 8, the district court did answer this question implicitly. Moreover, our decision certainly resolves that question. This action, then, will impact a larger audience than simply the Hershes and St. Joseph's, and this public impact certainly makes this case one for which attorneys' fees are appropriate.