HECKLER, SECRETARY OF HEALTH AND HUMAN
SERVICES *v.* COMMUNITY HEALTH SERVICES
OF CRAWFORD COUNTY, INC., ET AL.

No. 83–56.   Argued February 27, 1984—Decided May 21, 1984

52

*Deputy Solicitor General Geller* argued the cause for petitioner. With him on the briefs were *Solicitor General Lee, Assistant Attorney General McGrath, Carolyn F. Corwin, William Kanter,* and *Richard A. Olderman.*

*Raymond G. Hasley* argued the cause for respondents. With him on the brief was *Brian W. Ashbaugh.**

JUSTICE STEVENS delivered the opinion of the Court.

Under what is recognized for present purposes as an incorrect interpretation of rather complex federal regulations, during 1975, 1976, and 1977 respondent received and expended $71,480 in federal funds to provide health care services to Medicare beneficiaries to which it was not entitled. The question presented is whether the Government is estopped from recovering those funds because respondent relied on the express authorization of a responsible Government agent in making the expenditures.

I

Under the Medicare program, Title XVIII of the Social Security Act, 79 Stat. 291, as amended, 42 U. S. C. §§ 1395–1395vv, providers of health care services are reimbursed for the reasonable cost of services rendered to Medicare beneficiaries as determined by the Secretary of Health and Human Services (Secretary). § 1395x(v)(1)(A). Providers receive interim payments at least monthly covering the cost of serv-

---

*\*Jack N. Goodman* filed a brief for the National Association for Home Care et al. as *amici curiae* urging affirmance.

ices they have rendered. § 1395g(a). Congress recognized, however, that these interim payments would not always correctly reflect the amount of reimbursable costs, and accordingly instructed the Secretary to develop mechanisms for making appropriate retroactive adjustments when reimbursement is found to be inadequate or excessive. § 1395x(v)(1)(A)(ii).[1] Pursuant to this statutory mandate, the Secretary requires providers to submit annual cost reports which are then audited to determine actual costs. 42 CFR §§ 405.454, 405.1803 (1982). The Secretary may reopen any reimbursement determination within a 3-year period and make appropriate adjustments. § 405.1885.

The Act also permits a provider to elect to receive reimbursement through a "fiscal intermediary." 42 U. S. C. § 1395h; 42 CFR § 421.103 (1982). If the intermediary the provider has nominated meets the Secretary's requirements, the Secretary then enters into an agreement with the intermediary to have it perform those administrative responsibilities she assigns it. §§ 421.5, 421.110. These duties include receipt, disbursement, and accounting for funds used in making Medicare payments, auditing the records of providers in order to ensure payments have been proper, resolving disputes over cost reimbursement, reviewing and reconsidering payments to providers, and recovering overpayments to providers. §§ 421.100(b), (c), (e), (f), 421.120(e). The fiscal intermediary must also "serve as a center for, and communicate to providers, any information or instructions furnished to it by the Secretary, and serve as a channel of communication from providers to the Secretary." 42 U. S. C. § 1395h(a)(2)(A).

Respondent Community Health Services of Crawford County, Inc. (hereafter respondent), is a nonprofit corporation. In 1966 it entered into a contract with petitioner's predecessor, the Secretary of Health, Education, and Welfare, to provide home health care services to individuals eligi-

---

[1] Congress also authorized petitioner to adjust interim payments on account of previous overpayments or underpayments. § 1395g(a).

ble for benefits under Part A of the Medicare program, 42 U. S. C. §§ 1395c to 1395i–2. Under the contract, respondent received reimbursement through a fiscal intermediary, the Travelers Insurance Cos. (Travelers).

In 1973 Congress enacted the Comprehensive Employment and Training Act (CETA), 87 Stat. 839, codified, as amended, at 29 U. S. C. § 801 *et seq.* (1976 ed. and Supp. V), and repealed, Pub. L. 97–300, 96 Stat. 1357, authorizing the use of federal funds to provide training and job opportunities for economically disadvantaged persons. In 1975 respondent began participating in the program, which reimbursed it for the salaries and fringe benefits paid to certain of its employees. CETA funds made it possible for respondent to take on additional personnel and to provide additional home health care services.

To prevent what would be in effect double reimbursement of providers' costs, one of the regulations concerning reasonable costs reimbursable under the Medicare program indicates that grants received by a provider in order to pay specific operating costs must be subtracted from the reasonable costs for which the provider may receive reimbursement.[2]

---

[2] "(a) *Principle.* Unrestricted grants, gifts, and income from endowments should not be deducted from operating costs in computing reimbursable cost. Grants, gifts, or endowment income designated by a donor for paying specific operating costs should be deducted from the particular operating cost or group of costs.

"(b) *Definitions*—(1) *Unrestricted grants, gifts, income from endowment.* Unrestricted grants, gifts, and income from endowments are funds, cash or otherwise, given to a provider without restriction by the donor as to their use.

"(2) *Designated or restricted grants, gifts, and income from endowments.* Designated or restricted grants, gifts, and income from endowments are funds, cash or otherwise, which must be used only for the specific purpose designated by the donor. This does not refer to unrestricted grants, gifts, or income from endowments which have been restricted for a specific purpose by the provider.

"(c) *Application.* (1) Unrestricted funds, cash or otherwise, are generally the property of the provider to be used in any manner its management

After obtaining a CETA grant, respondent's administrator contacted Travelers to ask whether the salaries of its CETA-funded employees who provided services to patients eligible for Medicare benefits were reimbursable as reasonable costs under Medicare. Travelers' Medicare manager orally advised respondent that the CETA funds were "seed money" within the meaning of § 612.2 of the Provider Reimbursement Manual, which is defined as "[g]rants designated for the development of new health care agencies or for expansion of services of established agencies,"[3] and therefore, even though the CETA employees' salaries constituted specific operating costs paid by a federal grant, they were reimbursable under the Medicare program.

Relying on Travelers' advice, respondent included costs for which it was receiving CETA reimbursement in its cost reports, and received reimbursement for those sums amounting

deems appropriate and should not be deducted from operating costs. It would be inequitable to require providers to use the unrestricted funds to reduce the payments for care. The use of these funds is generally a means of recovering costs which are not otherwise recoverable.

"(2) Donor-restricted funds which are designated for paying certain hospital operating expenses should apply and serve to reduce these costs or group of costs and benefit all patients who use services covered by the donation. *If such costs are not reduced, the provider would secure reimbursement for the same expense twice; it would be reimbursed through the donor-restricted contributions as well as from patients and third-party payers including the title XVIII health insurance program.*" 42 CFR § 405.423 (1982) (emphasis supplied).

[3] *"Seed Money Grants.*—Grants designated for the development of new health care agencies or for expansion of services of established agencies are generally referred to as 'seed money' grants. 'Seed money' grants are not deducted from costs in computing allowable costs. These grants are usually made to cover specific operating costs or group[s] of costs for services for a stated period of time. During this time, the provider will develop sufficient patient caseloads to enable continued self-sustaining operation with funds received from Medicare reimbursement as well as from funds received from other patients or other third-party payers." Medicare Provider Reimbursement Manual, HIM–15, Pt. I, § 612.2 (Aug. 1968), reproduced in 1 CCH, Medicare & Medicaid Guide ¶ 5461 (1983).

to $7,694, $32,460, and $31,326 in fiscal 1975, 1976, and 1977, respectively.[4]   On several occasions during this period, respondent requested and received from Travelers oral verification of the propriety of this treatment.[5]   With these additional funds, respondent expanded its annual number of home health care visits from approximately 4,000 in 1974 to over 81,000 in the next three years.   Its annual budget increased during that period from about $200,000 to about $900,000.

It is undisputed that correct administrative practice required Travelers to refer respondent's inquiry to the Department of Health and Human Services for a definitive answer. However, Travelers did not do this until August 7, 1977, when a written request for instructions was finally submitted to the Philadelphia office of the Department's Bureau of Health Insurance.   Travelers was then formally advised that the CETA funds were not "seed money" and therefore had to be subtracted from respondent's Medicare reimbursement. On October 7, 1977, Travelers formally notified respondent of this determination.   Travelers then reopened respondent's cost reports for the preceding three years and recomputed respondent's reimbursable costs, determining that respondent had been overpaid a total of $71,480.

In May 1978 Travelers made a formal demand for repayment of the disputed amount.   Respondent filed suit and obtained temporary injunctive relief against the Secretary and Travelers; in November 1979, the parties entered into a

---

[4] Presumably because CETA program participants provided services to some individuals not eligible for Medicare benefits, the aggregate amount of CETA reimbursements was substantially larger than the portion for which Medicare reimbursement was claimed.   The total amount of reimbursement respondent received in CETA funds was $16,555, $53,952, and $81,118 in 1975, 1976, and 1977, respectively.

[5] From its review of the record the Court of Appeals concluded that respondent had consulted Travelers and was advised that the CETA grants qualified as "seed money" on five separate occasions.   However, the District Court made no finding as to the number of times that this advice was requested and received.

stipulation providing that the Secretary would postpone any attempts at recoupment and that the civil action would be stayed pending the outcome of administrative review.

Thereafter, the Secretary's Provider Reimbursement Review Board (PRRB) conducted a hearing and issued a written opinion rejecting the position that CETA funds were "seed money." The PRRB found, however, that the Secretary's right to recoup the 1975 overpayment was barred because Travelers had not given respondent a written notice of reopening within the 3-year limitations period;[6] thus, the amount in dispute was reduced to approximately $63,800. On April 10, 1980, respondent filed a complaint in the District Court seeking review of the administrative determination. The District Court consolidated that case with the equitable action that had been filed about two years earlier. On cross-motions for summary judgment, the District Court ruled in favor of the Secretary, accepting the PRRB's view of the Secretary's regulations and rejecting respondent's claim that the Secretary ought to be estopped to deny that the CETA grants were "seed money" because of the representations of her agent, Travelers. The District Court held that it was unreasonable for respondent to believe it could be in effect twice reimbursed for a given expense.[7]

The Court of Appeals reversed, reaching only the estoppel question. *Community Health Services of Crawford County, Inc. v. Califano*, 698 F. 2d 615 (CA3 1983). It held that the Government may be estopped by the "affirmative misconduct" of its agents and that Travelers' erroneous advice coupled with its failure to refer the question to the Secretary constituted such misconduct. It rejected as "clearly erroneous"

---

[6] The Board also found that the required written notice for 1976 had not been served on respondent, but noted that the Secretary still had time to comply with the notice requirement for that year. A timely notice for 1976 was thereafter served on respondent.

[7] The District Court also held that Travelers was not independently liable to respondent for its incorrect advice.

the District Court's finding that it was unreasonable for respondent to rely on Travelers' advice, concluding instead that respondent acted reasonably because the relevant regulation had no clear meaning and respondent had no source other. than Travelers to which it could turn for advice.

## II

Estoppel is an equitable doctrine invoked to avoid injustice in particular cases. While a hallmark of the doctrine is its flexible application, certain principles are tolerably clear:

> "If one person makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it and the other in reasonable reliance upon it does an act . . . the first person is not entitled
>
> .      .      .      .      .
>
> "(b) to regain property or its value that the other acquired by the act, if the other in reliance upon the misrepresentation and before discovery of the truth has so changed his position that it would be unjust to deprive him of that which he thus acquired." Restatement (Second) of Torts § 894(1) (1979).[8]

Thus, the party claiming the estoppel must have relied on its adversary's conduct "in such a manner as to change his position for the worse,"[9] and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading.[10] See *Wilber National Bank* v. *United States*, 294 U. S. 120, 124–125 (1935).

---

[8] See also Restatement (Second) of Agency § 8B (1958).

[9] 3 J. Pomeroy, Equity Jurisprudence § 805, p. 192 (S. Symons ed. 1941); see also *id.*, § 812.

[10] "The truth concerning these material facts must be unknown to the other party claiming the benefit of the estoppel, not only at the time of the conduct which amounts to a representation or concealment, but also at the time when that conduct is acted upon by him. If, at the time when he

When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant.[11] Petitioner urges us to expand this principle into a flat rule that estoppel may not in any circumstances run against the Government. We have left the issue open in the past,[12] and do so again today. Though the arguments the Government advances for the rule are substantial, we are hesitant, when it is unnecessary to decide this case, to say that there are *no cases* in which the public interest in ensuring that the Government can enforce the law free from

acted, such party had knowledge of the truth, or had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means, he cannot claim to have been misled by relying upon the representation or concealment." *Id.*, § 810, at 219 (footnote omitted).

[11] See, *e. g.*, *INS* v. *Hibi*, 414 U. S. 5, 8 (1973) *(per curiam); Federal Crop Insurance Corp.* v. *Merrill*, 332 U. S. 380, 383 (1947).

[12] See *INS* v. *Miranda*, 459 U. S. 14, 19 (1982) *(per curiam); Schweiker* v. *Hansen*, 450 U. S. 785, 788 (1981) *(per curiam); Montana* v. *Kennedy*, 366 U. S. 308, 315 (1961). In fact, at least two of our cases seem to rest on the premise that when the Government acts in misleading ways, it may not enforce the law if to do so would harm a private party as a result of governmental deception. See *United States* v. *Pennsylvania Industrial Chemical Corp.*, 411 U. S. 655, 670–675 (1973) (criminal defendant may assert as a defense that the Government led him to believe that its conduct was legal); *Moser* v. *United States*, 341 U. S. 41 (1951) (applicant cannot be deemed to waive right to citizenship on the basis of a form he signed when he was misled as to the effect signing would have on his rights). See also *Kaiser Aetna* v. *United States*, 444 U. S. 164, 178–180 (1979); *Santobello* v. *New York*, 404 U. S. 257 (1971); *Branson* v. *Wirth*, 17 Wall. 32, 42 (1873). This principle also underlies the doctrine that an administrative agency may not apply a new rule retroactively when to do so would unduly intrude upon reasonable reliance interests. See *NLRB* v. *Bell Aerospace Co.*, 416 U. S. 267, 295 (1974); *Atchison, T. & S. F. R. Co.* v. *Wichita Bd. of Trade*, 412 U. S. 800, 807–808 (1973) (plurality opinion); *SEC* v. *Chenery Corp.*, 332 U. S. 194, 203 (1947).

estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government.[13]  But however heavy the burden might be when an estoppel is asserted against the Government, the private party surely cannot prevail without at least demonstrating that the traditional elements of an estoppel are present.  We are unpersuaded that that has been done in this case with respect to either respondent's change in position or its reliance on Travelers' advice.

## III

To analyze the nature of a private party's detrimental change in position, we must identify the manner in which reliance on the Government's misconduct has caused the private citizen to change his position for the worse.  In this case the consequences of the Government's misconduct were not entirely adverse.  Respondent did receive an immediate benefit as a result of the double reimbursement.  Its detriment is the inability to retain money that it should never have received in the first place.  Thus, this is not a case in which the respondent has lost any legal right, either vested or contin-

---

[13] See generally *St. Regis Paper Co.* v. *United States*, 368 U. S. 208, 229 (1961) (Black, J., dissenting) ("Our Government should not by picayunish haggling over the scope of its promise, permit one of its arms to do that which, by any fair construction, the Government has given its word that no arm will do.  It is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with their government"); *Federal Crop Insurance Corp.* v. *Merrill*, 332 U. S., at 387–388 (Jackson, J., dissenting) ("It is very well to say that those who deal with the Government should turn square corners.  But there is no reason why the square corners should constitute a one-way street"); *Brandt* v. *Hickel*, 427 F. 2d 53, 57 (CA9 1970) ("To say to these appellants, 'The joke is on you.  You shouldn't have trusted us,' is hardly worthy of our great government"); *Menges* v. *Dentler*, 33 Pa. 495, 500 (1859) ("Men naturally trust in their government, and ought to do so, and they ought not to suffer for it").  See also *Giglio* v. *United States*, 405 U. S. 150, 154–155 (1972).

gent, or suffered any adverse change in its status.[14]   When a private party is deprived of something to which it was entitled of right, it has surely suffered a detrimental change in its position.   Here respondent lost no rights but merely was induced to do something which could be corrected at a later time.[15]

There is no doubt that respondent will be adversely affected by the Government's recoupment of the funds that it has already spent.   It will surely have to curtail its operations and may even be forced to seek relief from its debts through bankruptcy.   However, there is no finding as to the extent of the likely curtailment in the volume of services provided by respondent, much less that respondent will reduce its activities below the level that obtained when it was first advised that the double reimbursement was proper.   Respondent may need an extended period of repayment or other modifications in the recoupment process if it is to continue to operate, but questions concerning the Government's method of enforcing collection are not before us.   The question is whether the Government has entirely forfeited its right to the money.

A for-profit corporation could hardly base an estoppel on the fact that the Government wrongfully allowed it the interest-free use of taxpayers' money for a period of two or three years, enabling it to expand its operation.[16]   No more can respondent claim any right to expand its services to levels greater than those it would have provided had the error never occurred.   Curtailment of operation does not justify an estoppel when—by respondent's own account—the expansion

---

[14] This case is, therefore, plainly distinguishable from *Moser* v. *United States*, 341 U. S. 41 (1951), in which the petitioner "was led to believe that he would not thereby lose his rights to citizenship." *Id.*, at 46.

[15] See *Schweiker* v. *Hansen*, 450 U. S., at 789 *(per curiam)*.

[16] See *United States* v. *Stewart*, 311 U. S. 60, 70 (1940); *Sutton* v. *United States*, 256 U. S. 575 (1921); *Pine River Logging Co.* v. *United States*, 186 U. S. 279, 291 (1902); *Hart* v. *United States*, 95 U. S. 316 (1877).   See also *Automobile Club* v. *Commissioner*, 353 U. S. 180 (1957).

of its operation was achieved through unlawful access to governmental funds. And even if there will be a reduction below the service provided by respondent prior to its receipt of CETA funds, the record does not foreclose the possibility that the aggregate advantages to the community stemming from respondent's use of the money have more than offset the actual hardship associated with now being required to restore these funds. Respondent cannot raise an estoppel without proving that it will be significantly worse off than if it had never obtained the CETA funds in question.

## IV

Justice Holmes wrote: "Men must turn square corners when they deal with the Government." *Rock Island, A. & L. R. Co.* v. *United States*, 254 U. S. 141, 143 (1920). This observation has its greatest force when a private party seeks to spend the Government's money. Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law; respondent could expect no less than to be held to the most demanding standards in its quest for public funds. This is consistent with the general rule that those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law.[17]

---

[17] "Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority." *Federal Crop Insurance Corp.* v. *Merrill*, 332 U. S., at 384.

See *United States* v. *California*, 332 U. S. 19, 39–40 (1947); *United States* v. *Stewart*, 311 U. S., at 70; *United States* v. *San Francisco*, 310 U. S. 16, 31–32 (1940); *Wilber National Bank* v. *United States*, 294 U. S. 120, 123–124 (1935); *Utah* v. *United States*, 284 U. S. 534, 545–546 (1932); *Jeems Bayou Fishing & Hunting Club* v. *United States*, 260 U. S. 561, 564

As a participant in the Medicare program, respondent had a duty to familiarize itself with the legal requirements for cost reimbursement. Since it also had elected to receive reimbursement through Travelers, it also was acquainted with the nature of and limitations on the role of a fiscal intermediary. When the question arose concerning respondent's CETA funds, respondent's own action in consulting Travelers demonstrates the necessity for it to have obtained an interpretation of the applicable regulations; respondent indisputably knew that this was a doubtful question not clearly covered by existing policy statements. The fact that Travelers' advice was erroneous is, in itself, insufficient to raise an estoppel,[18] as is the fact that the Secretary had not anticipated this problem and made a clear resolution available to respondent.[19] There is simply no requirement that the Government anticipate every problem that may arise in the administration of a complex program such as Medicare; neither can it be expected to ensure that every bit of informal advice given by its agents in the course of such a program will be sufficiently reliable to justify expenditure of sums of money as substantial as those spent by respondent.[20] Nor was the advice given under circumstances that should have induced respondent's reliance. As a recipient of public funds well acquainted with the role of a fiscal intermediary, respondent knew Travelers only acted as a conduit; it could not resolve policy questions. The relevant statute, regulations, and Reimbursement Manual, with which respondent should have

---

(1923); *Sutton* v. *United States,* 256 U. S., at 579; *Utah Power & Light Co.* v. *United States,* 243 U. S. 389, 409 (1917); *Pine River Logging Co.* v. *United States,* 186 U. S., at 291; *Hart* v. *United States,* 95 U. S., at 318–319; *Gibbons* v. *United States,* 8 Wall. 269, 274 (1869); *Lee* v. *Munroe,* 7 Cranch 366 (1813).

[18] See *Schweiker* v. *Hansen,* 450 U. S., at 789–790 *(per curiam); Montana* v. *Kennedy,* 366 U. S. 308, 314–315 (1961).

[19] See *INS* v. *Miranda,* 459 U. S. 14 (1982) *(per curiam); INS* v. *Hibi,* 414 U. S. 5 (1973) *(per curiam).*

[20] See generally *Schweiker* v. *Hansen, supra.*

been and was acquainted, made that perfectly clear.[21]  Yet respondent made no attempt to have the question resolved by the Secretary; it was satisfied with the policy judgment of a mere conduit.[22]

The appropriateness of respondent's reliance is further undermined because the advice it received from Travelers was oral.  It is not merely the possibility of fraud that undermines our confidence in the reliability of official action that is not confirmed or evidenced by a written instrument.  Written advice, like a written judicial opinion, requires its author to reflect about the nature of the advice that is given to the citizen, and subjects that advice to the possibility of review, criticism, and reexamination.  The necessity for ensuring that governmental agents stay within the lawful scope of their authority, and that those who seek public funds act with scrupulous exactitude, argues strongly for the conclusion that an estoppel cannot be erected on the basis of the oral advice that underlay respondent's cost reports.  That is especially true when a complex program such as Medicare is involved, in which the need for written records is manifest.

In sum, the regulations governing the cost reimbursement provisions of Medicare should and did put respondent on

---

[21] Under the law of agency, a principal may be bound by the acts of an agent only if that agent acted with actual or apparent authority.  Restatement (Second) of Agency §§ 145, 159 (1958).  Travelers had neither with respect to the interpretation of the regulations in question.  See also *id.*, § 141, Comment *b* (principal may be estopped to deny lack of actual or apparent authority only when it negligently leads third parties to believe authority exists).

[22] The Court of Appeals believed that respondent did all it could have done since it was unable to deal with the Secretary directly.  However, that belief, even if accurate, would not make respondent's reliance on Travelers' policy judgment any more reasonable.  Moreover, given the role of Travelers as a conduit for information, it is far from clear that had respondent specifically requested that Travelers pass on its question to the Department, Travelers would not have been under a duty to do so.  Even if there were no such duty, there is nothing in the record to indicate that Travelers would have been unwilling to honor such a request.

ample notice of the care with which its cost reports must be prepared, and the care which would be taken to review them within the relevant 3-year period. Yet respondent prepared those reports on the basis of an oral policy judgment by an official who, it should have known, was not in the business of making policy. That is not the kind of reasonable reliance that would even give rise to an estoppel against a private party. It therefore cannot estop the Government.

Thus, assuming estoppel can ever be appropriately applied against the Government, it cannot be said that the detriment respondent faces is so severe or has been imposed in such an unfair way that petitioner ought to be estopped from enforcing the law in this case. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, concurring in the judgment.

I entirely agree with the Court that there was no estoppel in favor of respondent by reason of the Government's conduct in this case, because even a private party under like circumstances would not have been estopped. I write separately because I think the Court's treatment of our decided cases in this area gives an inaccurate and misleading impression of what those cases have had to say as to the circumstances, if any, under which the Government may be estopped to enforce the laws.

Sixty-seven years ago, in *Utah Power & Light Co.* v. *United States*, 243 U. S. 389 (1917), private parties argued that they had acquired rights in federal lands, contrary to the law, because Government employees had acquiesced in their exercise of those rights. In that case the Court laid down the general principle governing claims of estoppel on behalf of private individuals against the Government:

"As a general rule, laches or neglect of duty on the part of officers of the Government is no defense to a suit by it to enforce a public right or protect a public interest. [Citations omitted.] And, if it be assumed that the rule is subject to exceptions, we find nothing in the cases in hand which fairly can be said to take them out of it as heretofore understood and applied in this court. A suit by the United States to enforce and maintain its policy respecting lands which it holds in trust for all the people stands upon a different plane in this and some other respects from the ordinary private suit to regain the title to real property or to remove a cloud from it. [Citation omitted.]" *Id.*, at 409.

Since then we have applied that principle in a case where a private party relied on the misrepresentation of a Government agency as to the coverage of a crop insurance policy, a misrepresentation which the Court agreed would have estopped a private insurance carrier. *Federal Crop Insurance Corp.* v. *Merrill*, 332 U. S. 380, 383–386 (1947). We have applied it in a case where a private party relied on a misrepresentation by a Government employee as to Social Security eligibility, a misrepresentation which resulted in the applicant's losing 12 months of Social Security benefits. *Schweiker* v. *Hansen*, 450 U. S. 785 (1981) *(per curiam)*. And we have applied it on at least three occasions to claims of estoppel in connection with the enforcement of the immigration laws and the denial of citizenship because of the conduct of immigration officials. *INS* v. *Miranda*, 459 U. S. 14 (1982) *(per curiam)*; *INS* v. *Hibi*, 414 U. S. 5 (1973) *(per curiam)*; *Montana* v. *Kennedy*, 366 U. S. 308, 314–315 (1961). In none of these cases have we ever held the Government to be estopped by the representations or conduct of its agents. In *INS* v. *Hibi*, *supra*, at 8, we noted that it is still an open question whether, in some future case, "affirmative misconduct" on the part of the Government might be grounds for an estoppel. See *Montana* v. *Kennedy*, *supra*, at 314–315.

I agree with the Court that there is no need to decide in this case whether there are circumstances under which the Government may be estopped, but I think that the Court's treatment of that question, *ante,* at 60–61, gives an impression of hospitality towards claims of estoppel against the Government which our decided cases simply do not warrant. In footnote 12, *ante,* at 60, the Court intimates that two of our decisions have allowed the Government to be estopped: *United States* v. *Pennsylvania Industrial Chemical Corp.,* 411 U. S. 655 (1973), and *Moser* v. *United States,* 341 U. S. 41 (1951). But these cases are not traditional equitable estoppel cases. *Pennsylvania Industrial Chemical Corp.* was a criminal prosecution, and we held that "to the extent that [Government regulations] deprived [the defendant] of fair warning as to what conduct the Government intended to make criminal, we think there can be no doubt that traditional notions of fairness inherent in our system of criminal justice prevent the Government from proceeding with the prosecution." 411 U. S., at 674. And the Court's rather cryptic opinion in *Moser,* holding that an alien who declined to serve in the Armed Forces was not barred from United States citizenship pursuant to a federal statute, expressly rejected any doctrine of estoppel, and rested on the absence of a knowing and intentional waiver of the right to citizenship. 341 U. S., at 47.

We do not write on a clean slate in this field, and our cases have left open the possibility of estoppel against the Government only in a rather narrow possible range of circumstances. Because I think the Court's opinion, in its efforts to phrase new statements of the circumstances under which the Government may be estopped, casts doubt on these decided cases, I concur only in the judgment.