**WALDRON HEALTH CARE HOME, INC., Appellant–Petitioner,**

v.

**Suzanne MAGNANT, Administrator, Indiana Department of Public Welfare, Appellee–Respondent.**

No. 73A01–9009–CV–375.

Court of Appeals of Indiana, First District.

July 25, 1991.

Rehearing Denied Oct. 3, 1991.

Randall R. Fearnow, Steers, Sullivan, McNamar & Rogers, Indianapolis, for appellant-petitioner.

Linley E. Pearson, Atty. Gen., Sabra A. Weliever, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for appellee-respondent.

BAKER, Judge.

## STATEMENT OF THE CASE

Waldron Health Care Home, Inc. (Waldron) appeals the trial court's entry of a judgment affirming a State Welfare Board (Board) determination in favor of the Indiana Department of Public Welfare (the Department). The Department denied Waldron's request for a prospective adjustment of Medicaid[1] rates under 470 I.A.C. 5–4.1–6(e). We affirm.

## ISSUES

1. Whether the court erred in not finding the Board acted arbitrarily and capriciously in denying Waldron a prospective rate adjustment for June 1, 1986, through September 30, 1986.

2. Whether the court erred in not finding the Board acted arbitrarily and capriciously and in a manner contrary to the Department's own regulations when it applied the 45–day time limit contained in 470 I.A.C. 5–4.1–27 to Waldron's request for an adjustment.

3. Whether the court erred in not finding the Board acted arbitrarily and capriciously and violated Waldron's right to due process by failing to conduct an adequate review of the record.

## FACTS

Waldron is a family-owned corporation which operates a long-term care facility in Shelby County. On August 9, 1985, Waldron exercised an option to purchase the building which it had been leasing for its health care business from Reed Realty Company. Waldron operates on a fiscal year which ends on June 30th and is required to file Medicaid rate-setting documents with the Department on or before September 30th of each year.

On September 27, 1985, Waldron filed with the Department its annual historical report[2] for the fiscal year ending June 30, 1985, and its 12–month budget report[3] for the period from October 1, 1985, through September 30, 1986. In the annual report, Waldron reported the lease payments for the building. In the budget report, Waldron reported its anticipated ownership expenses of interest and depreciation.

Myers & Stauffer, the Department's Medicaid rate-setting contractor, announced Waldron's Medicaid rate on February 18, 1986. In late April 1986, after discussions with the Edgewood Consulting Group (Edgewood), Waldron became aware that it might qualify, because of its lease-to-purchase transaction with Reed Realty Company, for a rate adjustment under 470 I.A.C. 5–4.1–6(e). On April 25, 1986, Edgewood wrote Myers & Stauffer on Waldron's behalf requesting Waldron be given an adjustment retroactive to October 1, 1985. On April 29, 1986, Myers & Stauffer rejected Waldron's request for a retroactive adjustment citing Waldron's failure to request reconsideration of the rate within 45 days of its issuance as required by 470 I.A.C. 5–4.1–27(a).

On May 6, 1986, Edgewood advised the Department it was no longer pursuing retroactive relief for Waldron and was requesting only prospective relief effective June 1, 1986. Citing a lack of criteria support for a prospective 470 I.A.C. 5–4.1–6(e) rate adjustment, both Myers & Stauffer and the Department denied Edgewood's request.

---

1. The Medicaid Program was enacted as Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* and provides needs-based medical assistance.

2. *See* 470 I.A.C. 5–4.1–4.

3. *See* 470 I.A.C. 5–4.1–6(a).

Waldron administratively appealed the denial which resulted in a hearing officer's recommendation that the Department grant Waldron the adjustment and recompute Waldron's Medicaid per diem rate. The Board, however, overruled the hearing officer's recommendation.

Waldron then requested judicial review by the Shelby Circuit Court which remanded the case to the Board to enter written findings of facts and conclusions. On June 28, 1988, the Board entered specific findings of fact and conclusions and again overruled the hearing officer's recommendation. After Waldron filed an amended verified petition, the Shelby Circuit Court, on May 29, 1990, entered findings of fact, conclusions of law, and a judgment which upheld the Board's decision. Waldron now appeals the trial court's decision.

## DISCUSSION AND DECISION

### I.

### APPARENT APPLICABILITY OF 470 I.A.C. 5–4.1–6(e)

Waldron contends the trial court erred in failing to find that the Board acted arbitrarily and capriciously in denying Waldron a prospective 470 I.A.C. 5–4.1–6(e) rate adjustment for June 1, 1986, through September 30, 1986. Waldron bases its contention on the argument that 470 I.A.C. 5–4.1–6(e) is ambiguous and does not provide adequate notice to providers that it covers lease-to-purchase transactions. In essence, Waldron requests us to utilize a retrospective scope entitling it to enlightened hindsight.

■ Although we must defer to the findings of fact made by an administrative agency, like the trial court acting as a reviewing court, we may set aside any legal conclusions which are contrary to law. *Board of Trustees of Public Employees' Retirement Fund of Indiana* (1988), Ind., 519 N.E.2d 732, 733.

The provision in question, 470 I.A.C. 5–4.1–6(e), states:

When changes to historical costs meet the requirements of 470 IAC 5–4.1–5—470 IAC 5–4.1–8 and amount to five percent (5%) or more of the historical cost of the facilities and equipment as reported on the most recent annual report, the provider may request a rate review to establish a new basis for computation of the capital return factor portion of the rate. The change in the capital return factor shall be allowed subject to the annual rate increase limitation adjusted by the difference between the capital return factor allowed before the change and the capital return factor allowed after the change. The capital return factor allowed after the change shall be computed using the actual occupancy level for existing beds plus, *where appropriate,* those added census days needed to project the census in the additional beds at the greater of eighty percent (80%) or the occupancy the provider could reasonably anticipate for the additional beds. In no event shall the occupancy used to calculate the capital return factor be less than eighty percent (80%) of total beds available.

Rate reviews completed pursuant to this section will not constitute the provider's additional rate review in one reporting year.

(Emphasis added).[4]

Waldron contends 470 I.A.C. 5–4.1–6(e) appears to apply only to bed additions because it refers to additional beds twice and to existing beds once. The trial court rejected Waldron's contention, noting the phrase "where appropriate" clearly contemplates changes to historical costs other than the addition of beds. We agree with the trial court that interpreting the phrase otherwise would be meaningless. In addition, we emphasize that the threshold requirement for 470 I.A.C. 5–4.1–6(e), that changes "amount to 5% or more of the historical cost of the facilities and equip-

---

**4.** In addition to requesting a rate review under 470 I.A.C. 5–4.1–6(e), a provider may request no more than one additional rate review during a reporting year if the provider "can reasonably demonstrate the need for a change in rate based on more recent historical and budgeted data." 470 I.A.C. 5–4.1–6(b). Waldron has not argued that it qualified for such a review, however.

ment," does not restrict consideration to additional beds.

As the trial court found, the clear intent of 470 I.A.C. 5–4.1–6(e) is to give relief to a provider from previously set rates. The relief is permitted when changes amount to or exceed 5% of the historical costs of facilities and equipment as reported in the most recent annual report. The trial court also determined the language of 470 I.A.C. 5–4.1–6(e) is necessarily generic, but that it nevertheless clearly should have alerted Waldron's accountant to seek a rate adjustment because of the increase in the historical cost of its facility. The trial court did not err in drawing these conclusions.

■ We do not find the language of 470 I.A.C. 5–4.1–6(e) to be ambiguous. It broadly invites consideration of historical costs without attempting to specify all its potential applications. Upon preparing its budget report, Waldron and its accountant should have been alerted to the potential application of 470 I.A.C. 5–4.1–6(e) at least to the extent of requesting clarification from the Department or its rate-setter, Myers & Stauffer.

As the United States Supreme Court stated in considering a refund demand made upon a provider in the federal Medicare [5] program:

> Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law; ... This is consistent with the general rule that those who deal with the Government are expected to know the law ... There is simply no requirement that the Government anticipate every problem that may arise in the administration of a complex program such as Medicare; neither can it be expected to ensure that every bit of informal advice given by its agents in the course of such a program will be sufficiently reliable to justify expenditure of sums of money as substantial as those spent by respondent.

*Heckler v. Community Health Services of Crawford County, Inc.* (1984), 467 U.S. 51, 63–64, 104 S.Ct. 2218, 2225–26, 81 L.Ed.2d 42, 54–55.

Waldron does not accuse Myers & Stauffer or the Department's agent, Mr. Hartung, of giving incorrect or misleading information. They gave correct information. As the trial court noted, "The Department has no duty to inform providers how to maximize their reimbursement." *Record* at 14, Conclusion of Law 21. "It is not Myers and Stauffer's responsibility to try and present the information submitted by the provider in a light that would maximize their rates. The provider has the duty to elect 6(e) consideration." *Record* at 14, Conclusion of Law 22. The trial court did not err in making these conclusions.

Furthermore, contrary to Waldron's contention, we do not find the court's Conclusions of Law 10 through 19, *see Record* at 11–14, to be irrational or contrary to the evidence. The conclusions construe 470 I.A.C. 5–4.1–6(e) and determine Waldron should have realized the regulation clearly applied to its situation.

The Medicaid program is not designed to protect providers from the consequences of ill-advised business decisions. *Indiana Dept. of Public Welfare v. Crescent Manor* (1981), Ind.App., 416 N.E.2d 470, 476. Waldron failed to realize 470 I.A.C. 5–4.1–6(e) was or could be applicable to its lease-to-purchase transaction. In addition, Waldron failed to clarify with the Department or its rate-setter, at the time of the transaction or at the time of the preparation of its budget report, any doubts about the applicability of 470 I.A.C. 5–4.1–6(e). Finally, Waldron failed to discuss the transaction with its own consultant until more than 6 months after submitting its budget report and more than 45 days after the Department issued Waldron's Medicaid rate. All of the foregoing business decisions resulted in the Department's denial of a prospective rate adjustment for the period June 1, 1986, through September 30, 1986. The trial court did not err in failing to find the Board arbitrarily and capriciously denied Waldron a prospective rate adjustment.

---

**5.** Medicare was enacted as Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* and provides health insurance for the aged and disabled.

Waldron argues the Department permitted a different nursing home, Wildwood Manor, a 470 I.A.C. 5–4.1–6(e) adjustment for a lease-to-purchase transaction and improperly failed to promulgate its interpretation as a rule.[6] Waldron relies upon *Blinzinger v. Americana Healthcare Corp.* (1984), Ind.App., 466 N.E.2d 1371 and *Community Care Centers v. Dept. of Public Welfare* (1988), Ind.App., 523 N.E.2d 448.

In *Blinzinger* we held the Department could not apply a rate freeze directive against Medicaid providers because it had not first promulgated the directive as required by IND.CODE 4–22–2 *et seq.* The Department, in the present case, did not issue a directive when permitting Waldron a rate adjustment. Instead, the Department merely interpreted 470 I.A.C. 5–4.1–6(e) which existed already.

In *Community Care Centers* we held the Department must be guided by ascertainable standards when granting or denying Medicaid rate adjustments. The facts of that case arose in 1982, and we noted the Department had promulgated 470 I.A.C. 5–4.1–6 in 1983 to provide the necessary standards. Thus, ascertainable standards existed when the facts of the present case arose in 1985. Waldron is arguing the Department should promulgate a rule interpreting 470 I.A.C. 5–4.1–6(e), a rule previously promulgated. We find no support for Waldron's argument in the two cases it cites, and we thus reject it.

## II.

### TIMELINESS OF REQUEST

Waldron argues the trial court erred in failing to find the Board acted arbitrarily and capriciously in denying Waldron a Medicaid rate adjustment because Waldron failed to request the adjustment within 45 days after the Department issued the rate.[7] For their determinations that Waldron's request was untimely, the Department, Board, and trial court relied upon 470 I.A.C. 5–4.1–27(a). This regulation requires a provider to request a reconsideration of a Medicaid rate within 45 days of issuance of the rate.

Waldron contends 470 I.A.C. 5–4.1–6(e) does not contain a time limit for requesting a rate adjustment due to an extraordinary change in historical costs. Furthermore, Waldron argues, 470 I.A.C. 5–4.1–27(a) applies only to reconsideration of a provider's annual Medicaid rate and does not apply to provider requests for rate adjustments under 470 I.A.C. 5–4.1–6(e).[8]

Waldron purchased its facility on August 9, 1985. Waldron could have requested a rate review at that time pursuant to 470 I.A.C. 5–4.1–6(e). We repeat that portion of the regulation which provides: "When changes to historical costs meet the requirements ... and amount to five percent (5%) or more of the historical cost ... as reported on the most recent annual report, the provider may request a rate review ..."

At the administrative hearing, Waldron admitted Exhibit B, entitled "State of Indiana Department of Public Welfare Instructions for the Medicaid Financial Report for Nursing Homes." Section D of the "Suggested Filing Format" portion of the instructions addresses rate requests stemming from capital expenditures exceeding 5% of property basis. In that section appears the statement, "Suggested due date is within 30 days after project completion or 30 days after notification of

---

6. *See* IND.CODE 4–22–2–3 *et seq.* regarding the process of rulemaking.

7. The Department contends Waldron has waived this issue by failing to raise it before the trial court. We agree with Waldron that its Verified Amended Complaint for Judicial Review sufficiently raises the issue.

8. We disagree with Waldron's contention that 470 I.A.C. 5–4.1–27 is limited to reconsiderations of annual rate reviews. The language of the regulation indicates that reconsiderations are to be made "within forty-five (45) days after receipt by the provider of *the rate computed* by the contractor." (Emphasis added.) The language does not specify that the provision includes only annual rate reviews while excluding additional rate reviews under 470 I.A.C. 5–4.1–6(b) and rate reviews under 470 I.A.C. 5–4.1–6(e). Nevertheless, this observation is not dispositive of the issue.

certification, whichever is later." *Record* at 498.

In addition, a paragraph within the part of the report entitled "Specific Instructions" discusses "Schedule J Analysis of Property." The paragraph provides in pertinent part:

On a rate request—budget the historical cost at the beginning of period should be equal to the ending balance on the latest annual report.... Major additions amounting to more than five percent of total property will not be considered on a regular annual rate review but will await the actual date such additions are placed into service. At that time the provider can apply for a rate review in accordance with the Criteria. These should not be included on a budget of a regular annual rate review....

*Record* at 504.

These two instructions clarify that rate reviews which are based on changes in historical costs and requested pursuant to 470 I.A.C. 5–4.1–6(e) are not tied to annual rate reviews. Instead, they are triggered by any transaction which causes a change to historical costs. We agree with the trial court's conclusion that:

The language of 6(e) does establish a specific time frame within which the 6(e) request must be made. In order for there to be a change in historical costs there must be a transaction. The occurrence of the transaction is the identifiable point in time when the historical costs change.

*Record* at 14, Conclusion of Law 23.

■ Although Waldron correctly notes that 470 I.A.C. 5–4.1–6(e) does not explicitly state a time limit, the implicit time limit is the period from the transaction causing the extraordinary change in historical costs to the time the next annual report requesting a rate review is made. To say otherwise

would allow a provider to request new rates based on extraordinary changes in historical costs at any time. Public policy requires the efficient closure of reporting periods. Although our interpretation might appear harsh to a provider incurring a change in historical costs shortly before the annual report and budget due date, we believe that a provider could use 470 I.A.C. 5–4.1–6(b) to request a rate change. Alternatively, a provider could wait until the Department issues a rate and then request timely reconsideration pursuant to 470 I.A.C. 5–4.1–27(a). In either case, we believe the Department should permit the provider to request that the rate review establish a new basis for computation of the capital return factor portion of the rate in accordance with 470 I.A.C. 5–4.1–6(e). Therefore, Waldron should have requested a 470 I.A.C. 5–4.1–6(e) rate review shortly after the August 9, 1985, purchase date and before making its annual request for rate review on September 27, 1985.

■ Although Waldron did not request a rate review between the date of purchase of its facility and the date it filed its annual report, Waldron still could have requested a rate review because of the extraordinary change in its historical costs. Waldron could have requested the rate review pursuant to 470 I.A.C. 5–4.1–6(a) when it made its annual report and submitted a budget report for October 1, 1985, through September 30, 1986. Waldron failed to request a 470 I.A.C. 5–4.1–6(e) rate review because of a change in historical costs when it made its annual report and budget report pursuant to 470 I.A.C. 5–4.1–6(a).[9]

Nevertheless, Waldron had yet one more chance of obtaining a rate adjustment for the months before it turned in a new budget for the period beginning October 1, 1986.[10] After being issued a Medicaid rate

9. "As a normal practice, rates shall be reviewed once each year using the annual financial report as the basis of the review. The rate effective date shall be the first day of the fourth month following the provider's reporting year end ... If the provider requests that the rate be reviewed, a projected financial report covering the twelve (12) month period immediately follow-

ing the expected rate effective date shall be prepared by the provider and submitted with the annual financial report." 470 I.A.C. 5–4.1–6(a).

10. Of course, Waldron could have requested an additional rate review pursuant to I.A.C. 5–4.1–6(b) or a rate review under 470 I.A.C. 5–4.1–6(e)

by Myers & Stauffer on February 18, 1986, Waldron could have requested a reconsideration of the rate within 45 days pursuant to 470 I.A.C. 5–4.1–27(a). Waldron did not request reconsideration until April 25, 1986, when its agent wrote Myers & Stauffer and requested a 470 I.A.C. 5–4.1–6(e) adjustment retroactive to October 1, 1985. Thus, Waldron failed to timely request reconsideration. We find no error in the trial court's affirmance of the Board's denial of Waldron's request for prospective relief commencing June 1, 1986.

## III.

### MEANINGFUL REVIEW

Waldron asserts the trial court erred in affirming the Board's judgment reversing the hearing officer's recommendation because the Board did not meaningfully review the hearing officer's findings thereby violating Waldron's right to due process. Waldron alleges the Board did not review the hearing transcript before reaching its own conclusion.

Waldron relies on *Stanley v. Review Board* (1988), Ind.App., 528 N.E.2d 811 to support its contentions. In *Stanley,* we reversed a determination of the review board of the Department of Employment and Training Services. We held the review board violated Stanley's due process rights by reversing a referee's finding solely upon demeanor credibility without first holding a hearing to reassess the witnesses' demeanor. Noting that our holding was extremely narrow, we stated, "before due process rights are irrevocably jeopardized, demeanor credibility must be the sole determinative factor in reversing a referee's finding." *Id.* at 815. The demeanor credibility of Waldron and the other witnesses was not an issue in this case. Therefore, our holding in *Stanley* does not apply to the present facts.

should new circumstances have arisen before

Waldron also relies on *Sandlin v. Review Board* (1980), Ind.App., 406 N.E.2d 328 for support. In *Sandlin* we stated that due process requires a claimant to have an opportunity to be heard and to appear by counsel at an administrative hearing. *Id.* at 332. Waldron does not demand another opportunity to appear and be heard but simply a careful review of the hearing officer's findings.

The record reflects that not only was the hearing record before the Board, but also the parties' post-hearing briefs and the Department's proposed findings were before the Board. After the court's remand to the Board, the Board entered five conclusions accepting and rejecting particular portions of the hearing officer's recommendation. The record provides no support for Waldron's allegation that the Board did not review the transcript from the hearing thereby violating Waldron's due process rights.

Moreover, we find no support for Waldron's contention that the Board's findings in general were unsupported by the evidence. Finally, we do not find the two conclusions of law singled out by Waldron as examples of unsupported findings, Conclusions 17 and 23, to be unsupported. In fact, we approved the content of each conclusion during our discussion of Issues One and Two. The trial court did not err in affirming the Board's decision.

Affirmed.

ROBERTSON and STATON, JJ., concur.