**In re Thomas MANDO, Diane Mando, Debtors.**

**Thomas MANDO, Plaintiff,**

v.

**UNITED STATES of America, INTERNAL REVENUE SERVICE, Defendant.**

**Bankruptcy No. 91–01021.
Adv. No. 92–2026.**

United States Bankruptcy Court,
E.D. Kentucky,
Covington Division.

May 12, 1993.

Dennis Williams, Covington, KY, for debtor.

Carol Priest, U.S. Dept. of Justice, Tax Div., Washington, DC, for U.S.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

WILLIAM S. HOWARD, Bankruptcy Judge.

#### I. Findings of Fact

This matter came on for trial before the Court on January 11, 1993. The Court having considered the testimony offered at trial, the joint stipulation of the parties, the briefs submitted by the parties, and the documentary and other pertinent evidence of record in this case, and being otherwise fully advised, now, in accordance with Rule 52 of the Federal Rules of Civil Procedure, made applicable herein by Federal Rule of Bankruptcy Procedure 7052, makes the following Findings of Fact and Conclusions of Law:

The plaintiff filed this action to have this Court determine the extent and amount, if any, of his personal obligation by virtue of an assessment under the civil penalty provisions of 26 U.S.C. § 6672 for non-payment of the trust fund portion of payroll taxes not paid by Tru–Site Laboratories, Inc. for the second, third and fourth quarters of 1987.

The plaintiff, Thomas Mando, is the debtor in this case and a trained optician. He is a stockholder of the corporate entity, Tru-Site Laboratories, Inc. ("Tru–Site"), which filed Chapter 7 bankruptcy in this Court (Case No. 91–00839) on May 21, 1991. Tru–Site is a Kentucky corporation incorporated on February 19, 1982, naming as its directors William P. Mando, Jr., John M. Mando, and Thomas C. Mando. Tru–Site continued in business until it ceased operations in 1991. From its inception, Tru–Site engaged in the business of manufacturing and the wholesale and retail sale of eyeglasses and contact lenses.

During 1987 and 1988 the plaintiff was the president of Tru–Site. His brother, William P. Mando, Jr., an accountant, was secretary-treasurer of Tru–Site until March 4, 1988 when he resigned. The plaintiff handled the sales and customer service aspect of the business; his brother was in charge of finances. In 1987, both the plaintiff and his brother had authority to sign checks on the corporate checking accounts. Tru–Site did not timely file its Forms 941, Employer's Quarterly Federal Tax Returns, for the first, second, third and fourth quarters of 1987. These were filed on or about February 8, 1988, bearing the signature of the plaintiff. No payment was remitted with these filings. The total tax liability for 1987 trust fund taxes was $71,030.23.

The plaintiff first became aware of a problem at Tru–Site in early 1988 after his brother had made a trip to Florida, purportedly to be with their father who was having medical tests. Soon after William Mando left, an expected payroll delivery did not take place. When the plaintiff called the bank, he was told that the payroll would not be released because Tru–Site's account was overdrawn by $20,000.00. The plaintiff called in Don Fritz, a C.P.A. ("Fritz"), to analyze the situation. Fritz found the financial records of the company in disarray. He discovered unopened tax notices.

He contacted John Zelasko ("Zelasko"), a revenue officer in the Internal Revenue Service ("I.R.S.") office in Erlanger, and was advised that the above-referenced returns for the first, second, third and fourth quarters of 1987 should be filed, and they were filed as set out above.

On March 7, 1988, a meeting took place with the plaintiff, Zelasko, Fritz, and Mike Gray, another accountant from his office. At a subsequent meeting on April 22, 1988, an installment payment agreement was agreed to which allowed Tru–Site to pay $3000.00 per month toward the delinquent taxes. Zelasko assured the plaintiff that it was in the I.R.S.'s best interest that the business continue to operate. A later entry in Zelasko's investigation history notes states "... brother [William Mando] will take full responsibility for 100% assessment." Fritz felt that this meeting produced an agreement that the plaintiff would not be looked to as a "responsible person" for purposes of a 100% penalty assessment. The first $3000.00 installment payment was made in May 1988.

Zelasko interviewed the plaintiff in August 1988 to make the determination about whether the plaintiff should be pursued as a responsible person. He had before him at this time a signed statement from William Mando stating that he was solely responsible for paying over trust fund taxes. William Mando had been interviewed in July 1988. Zelasko also reviewed bank signature cards, copies of cancelled checks to see who actually signed checks on behalf of the corporation, and tax returns. Several months after these interviews and the review of documents Zelasko recommended that the plaintiff not be pursued personally for the 100% penalty assessment. His recommendation was approved by the acting I.R.S. Group Manager, Jo Ann Brumer.

Tru–Site and the I.R.S. entered into several installment payment agreements over the course of time because the corporation was having trouble making the installment payments. No change was made in the responsible person recommendation, however, even after Zelasko was promoted to a supervisory position in April 1989 and another revenue officer, Carol Coleman, took over the Tru–Site file. She in fact recommended that the plaintiff's status be maintained and Zelasko approved that recommendation. An installment agreement calling for monthly payments of $2000.00 was entered into in September 1989. At the time of that installment agreement, the total owed for taxes and interest was $87,-539.83. Penalties had been abated.

Sam McKinney ("McKinney") became the revenue officer for Tru–Site in January 1990. After McKinney became the revenue officer he reviewed the case file and decided that the plaintiff should be pursued as a responsible person. He testified that he made this determination based on facts that had been in the file and available to the other revenue officers involved in the case. No new facts were developed.

In response to the I.R.S.'s apparent change of position, Gerald Dusing, an attorney representing the plaintiff and Tru–Site, met twice with McKinney and the plaintiff. At the second meeting in October 1990 Zelasko was also present. Once again Zelasko acknowledged the I.R.S.'s position concerning the plaintiff's responsibility, and another installment agreement was entered into, based on the premise that he would not be pursued personally. The amount owed at that time was $66,381.05. During this period, the plaintiff attempted to sell the business, but was unsuccessful. The plaintiff filed a Chapter 7 bankruptcy petition on June 21, 1991; Tru–Site filed its petition in May 1991. In April 1991 McKinney recommended that the plaintiff be assessed personally. This recommendation was approved by Zelasko. The amount owed as of April 15, 1991, was $55,351.22.

All the payments that the plaintiff made were "non-directed", that is, the I.R.S. applied the payments to whatever tax liabilities it chose, not just the trust fund portion. The plaintiff paid a total of some $43,000.00 on what was owed for 1987. The first quarter taxes were paid, as well as some portion of what was due for the second quarter. The balance due was on the remainder of that quarter as well as

the third and fourth quarters. Tax liabilities subsequent to 1987 were paid.

## II. Conclusions of Law

This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b); it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The issues in this matter are whether the plaintiff is, for purposes of 26 U.S.C. § 6672, a "responsible person" who "willfully" failed to pay over withholding taxes due from the corporate entity Tru-Site, and, if he is such a person, whether the defendant is nevertheless estopped by the actions of its agent from pursuing him personally for the taxes owed.

■ The elements required for a finding of responsibility have been set out in at least two Sixth Circuit cases, *Gephart v. U.S.*, 818 F.2d 469 (1987) and *McDermitt v. U.S.*, 954 F.2d 1245 (1992). In *Gephart*, the court stated:

> Among the specific facts which courts have relied upon in determining whether individuals were persons responsible for the payment of taxes withheld from the wages of employees are: (1) the duties of the officer as outlined by the corporate by-laws; (2) the ability of the individual to sign checks of the corporation; (3) the identity of the officers, directors, and shareholders of the corporation; (4) the identity of the individuals who hired and fired employees; (5) the identity of the individuals who were in control of the financial affairs of the corporation. (Cites omitted).
>
> More than one person can be a responsible officer of a corporation.... Essentially, liability is predicated upon the existence of significant, as opposed to absolute, control of the corporation's finances.... It is basically a factual inquiry. Generally, such a person is one 'with ultimate authority over expenditure of funds since such a person can fairly be said to be responsible for the corporation's failure to pay over its taxes,' or more explicitly, one who has 'authority to direct payment of creditors.' (Cites omitted).

At page 473.

In the same vein, the *McDermitt* court found a taxpayer to be "responsible" where he was not an officer of the corporation but had complete power and authority to dictate the order in which corporate liabilities were paid. The president and treasurer of the corporation were subject to his direction and control. His wife, holder of 80% of the stock of the corporation, had no say in the conduct of the business. The taxpayer went so far as to set up a secret bank account in which to sequester funds from the Internal Revenue Service. These funds were being used to pay another creditor. *Id.*, p. 1247.

The court in *O'Connor v. U.S.*, 956 F.2d 48 (4th Cir.1992) identified the key element in deciding responsibility as

> ... whether that person has the statutorily imposed duty to make the tax payments. This duty is considered in light of the person's authority over an enterprises's finances or general decision making.... This authority is generally found in high corporate officials charged with general control over corporate business affairs who participate in decisions concerning payment of creditors and disbursement of funds.... However, a party cannot be presumed to be a responsible person merely from titular authority. Most corporate officers probably do have the authority to make disbursements, particularly in a closely held corporation ... The focus must instead be on substance rather than form.... The substance of the circumstances must be such that the officer exercises and uses his authority over financial affairs or general management, or is under a duty to do so, before that officer can be deemed to be a responsible person. (Cites omitted).

At page 51.

■ In applying these decisions to the facts in this case, the Court is aware that there appears to be some support for both parties. On the one hand, the Court is convinced that the plaintiff and his brother truly had a dichotomy of function in the business. The plaintiff had little or nothing to do with the financial end of the business, and apparently knew even less

about it. He trusted his brother to take care of everything, and had never had any reason not to trust him. On the other hand, the evidence brought forth in this case does not suggest that the plaintiff was a mere figurehead in the company, or that his brother generally had more authority than he did.

The plaintiff's argument concerning responsibility seems to be that since his brother functioned exclusively in the financial area of the business, he must be exclusively responsible for the payment of taxes. The flaw in this argument is that it does not acknowledge the plaintiff's authority. He was not just an investor with a title. He was involved in the day-to-day operation of the business. His authority, generally speaking, was at least equal to his brother's, even if he did not exercise it in the financial area. This Court believes that the law applied to the facts in this case support a finding that the plaintiff was a "responsible person".

█ As concerns the question of willfulness, the *Gephart* court stated at page 475, "Willfulness is present if the responsible person had knowledge of the tax delinquency and knowingly failed to rectify it when there were available funds to pay the government." The plaintiff argues that the funds in question were first of all after-acquired funds, and were not "available" to pay taxes because all of Tru–Site's assets were pledged to Central Trust. The plaintiff has cited *Slodov v. United States*, 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978) and *Honey v. U.S.*, 963 F.2d 1083 (8th Cir.1992), in support of his position concerning willfulness.

*Slodov* held that "a responsible person ... does not violate § 6672 by willfully using employer funds for purposes other than satisfaction of the trust-fund tax claims of the United States when *at the time he assumed control* there were no funds with which to satisfy the tax obligation and the funds thereafter generated are not directly traceable to collected taxes referred to by that statute." 436 U.S. at page 259, 98 S.Ct. at page 1791 (emphasis added). The taxpayer in *Slodov* bought

and assumed control of the company after the obligation to pay the taxes arose and the funds to pay them had been dissipated. The fact pattern in the within matter is obviously not the same.

The court in *Honey* acknowledged that the holding in *Slodov* was limited to the situation in which an individual becomes responsible after the taxes are payable and the trust funds are dissipated. The court went on to define "unencumbered funds", stating that "... funds are encumbered only where the taxpayer is legally obligated to use the funds for a purpose other than satisfying the preexisting employment tax liability and if that legal obligation is superior to the interest of the IRS in the funds." *Honey*, at pages 1089–1090.

In analyzing the issue of unencumbered funds, the court considered whether a creditor's security interest in proceeds was superior to the interest claimed by the I.R.S., and found that the creditor's security interest in proceeds was indeed superior to the interest of the I.R.S. in funds in the company's corporate account to the extent that the funds were proceeds from the sale of inventory. The court went on to consider whether the creditor's security interest prevented the use of those funds for the payment of the tax obligation. The court found that the security agreement placed no restrictions on the use of proceeds from the sale of inventory which would have precluded payment of the tax liability. *Honey*, at pages 1901–1092.

In this matter, the Court encounters the same situation in regard to Central Trust. While the plaintiff argues vigorously that Central Trust would have stepped in and closed everything down if he had dared to use proceeds to satisfy tax obligations, he presents no proof that Central Trust could have in fact prevented him from using the proceeds in this way. This Court must therefore conclude, as the *Honey* court did, that the plaintiff has not demonstrated that the funds were encumbered.

The plaintiff, however, views the questions of willfulness and estoppel as interrelated. The plaintiff argues that the assurances of agent Zelasko that he would not

be held personally responsible were instrumental in his decision to continue to run the business rather than to close it, and in order to keep the business running he had to pay creditors, especially Central Trust. Absent the estoppel argument, there is little doubt that the plaintiff's actions in paying Central Trust and other creditors ahead of the defendant were willful.

■ Having determined that the plaintiff is a responsible person who willfully failed to pay taxes that were due and owing, this Court must now decide if the I.R.S. is estopped from personally assessing the plaintiff on account of the actions of its agents. The plaintiff has contended that he may assert estoppel because he has demonstrated 1) misrepresentation by an agent of the United States acting within the apparent scope of his duties; 2) absence of contrary knowledge by the taxpayer under the circumstances, where the taxpayer may reasonably act in reliance; 3) actual reliance; 4) detriment; and 5) factual context in which the absence of equitable relief would be unconscionable. *La Difference Restaurant, Inc., In re,* 63 B.R. 819 (S.D.N.Y. 1986).

The I.R.S. has countered that estoppel is generally not available against the government, and that in any case estoppel will not lie against the government in the same way that it will lie against a private individual. It cites in support of its position *Office of Personnel Management v. Richmond,* 496 U.S. 414, 415, 110 S.Ct. 2465, 2466, 110 L.Ed.2d 387 (1990). That case, however, was decided on the narrow issue of whether the government was estopped from denying benefits not otherwise permitted by law to a claimant who had received erroneous advice from a government employee. The Supreme Court held that payments of money from the Federal Treasury are limited to those authorized by statute, and that the claimant was ineligible for benefits under the pertinent statute. The Court declined to address the government's suggestion that the Court adopt a flat rule that no estoppel will ever lie against the government under any circumstances.

Another case cited by the defendant, *Heckler v. Community Health Services of Crawford,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984), also involved a claim to funds, in this instance an overpayment of medicare reimbursements for salaries. In discussing estoppel generally the Court stated

> ... it is well settled that the Government may not be estopped on the same terms as any other litigant. Petitioner urges us to expand this principle into a flat rule that estoppel may not in any circumstances run against the Government. We have left the issue open in the past, and do so again today. Though the arguments the Government advances for the rule are substantial, we are hesitant, when it is unnecessary to decide this case, to say that there are *no cases* in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government.

At page 60–61, 104 S.Ct. at page 2224. It is the opinion of this Court that the "minimum standard of decency, honor, and reliability" is what is at issue in this matter. The plaintiff herein is not seeking to retain or to avoid paying back public funds incorrectly disbursed, as the claimants in the above-cited cases were.

The plaintiff seeks to rely on both oral and written statements and actions of agents of the I.R.S. which convinced him to pursue a certain course of action. That decision, he contends, worked to his detriment when the I.R.S. later changed its position. This Court agrees. The I.R.S. consistently treated and dealt with the plaintiff as a non-responsible party. Recommendations were made and approved by superiors on more than one occasion that the plaintiff be so treated. There is no evidence in the record that so much as a suggestion was made to the plaintiff that he might eventually be treated as a responsible person.

The I.R.S.'s argument concerning Zelasko's lack of authority to compromise a claim is irrelevant. During the time that Zelasko was dealing with the plaintiff, there had been no liability assessed against the plaintiff to be compromised. Zelasko apparently did have the authority to recommend that the plaintiff not be held responsible, and his superior at the time apparently had the authority to approve this recommendation. When Zelasko became a supervisor he apparently had the authority to approve the same recommendation. This treatment of the plaintiff was consistent and ongoing until the bankruptcy filings. If the I.R.S. intended to pursue the plaintiff as a responsible person, it should have done so from the very beginning.

In consideration of all of the foregoing, it is therefore the opinion of this Court that the I.R.S. may not pursue the plaintiff as a responsible person pursuant to 26 U.S.C. § 6672. A judgment consistent with this opinion will be entered separately.